IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| William J. Sheldon <br> ███████████████ <br><br> Plaintiff, <br><br> v. <br><br> Cuyahoga Metropolitan Housing <br> Authority <br> 8120 Kinsman Road <br> Cleveland, OH 44104 <br>     and <br><br> Gregory Drew, in his official and individual <br> capacities, <br> Police Lieutenant <br> 5715 Woodland Avenue <br> Cleveland, OH 44104 <br><br>    Defendants. | Case No.: <br><br><br><br><br> Judge: <br><br><br><br><br><br><br><br><br><br> COMPLAINT <br><br> (Jury demand enclosed) |

Now comes Plaintiff William J. Sheldon ("Plaintiff", "William Sheldon" or "Sheldon"), and for his Complaint against Defendant Cuyahoga Metropolitan Housing Authority ("Defendant" or "CMHA"), and Defendant Gregory Drew ("Drew"), states that months after complaining about racial disparities in his workplace treatment by command staff involving several of the same defendants herein, he reported matters of public concern, and complained of harassment and retaliation by Defendant Drew, Defendants under color of state law retaliated against him by terminating his employment and interfering in at least two separate law enforcement job opportunities Plaintiff sought

outside the CMHA. Thereafter, Defendant CMHA under color of state law upheld the retaliatory actions of Defendant Drew.

Plaintiff's rap music and rap videos are at the center of this matter. However, when government suppresses speech under the pretense that the ideas expressed in that speech are offensive or disagreeable, the public expression of ideas in rap music or rap videos may not be prohibited because the ideas are offensive to some hearers.

## PARTIES

1. William Shelton is, and has at all times relevant been, a citizen of the United States and a resident of Cuyahoga County in the State of Ohio. Plaintiff Shelton is an experienced law enforcement officer employed by Defendant CMHA. Shelton initiates this action after learning that Defendants have interfered and prevented him from securing law enforcement employment opportunities outside the CMHA. Shelton at all times relevant herein reported to Defendant Drew.

2. Defendant CMHA is a political subdivision of the State of Ohio charged with the administration of a public school district and at all relevant times herein acted under color of state law and is subject to the mandates of the Constitution and 42 U.S.C. § 1983 and is obligated to operate pursuant to the rules and regulations of the State of Ohio and pursuant to obligations under the Constitutions of the State of Ohio and the United States. Defendant CMHA owns and manages property and administers rent subsidy programs for low-income individuals and families and providing affordable housing in Cuyahoga County.

3. Andres Gonzalez is the Chief of Police of Defendant CMHA and at all relevant times acted under color of state law and in his official capacity is governed by the rules and

3

regulations of the State of Ohio and pursuant to obligations under the Constitution of the State of Ohio and the United States. As such, he is responsible for the formulation, implementation and enforcement of all policies, practices, procedures, acts, and conduct regarding the administration of safety and security in the CMHA. Gonzalez exercises supervisory and policymaking authority under color of state law. Gonzalez is responsible for employment actions, including hiring, suspension, reassignment, discipline, and termination. At all times relevant herein Gonzalez supervised Defendant Drew and reported to Defendant CMHA.

4.  Defendant Gregory Drew is Caucasian and a Lieutenant in the command staff of the CMHA Police Department and at all relevant times acted under color of state law in his official capacity, is obligated to work pursuant to the rules and regulations of the State of Ohio and pursuant to obligations under the Constitution of the State of Ohio and the United States and, as such, he is responsible for the formulation, implementation and enforcement of all policies, practices, procedures, acts, and conduct regarding the administration of safety and security for CMHA. Defendant Drew is sued in both his individual and official capacities.

JURISDICTION AND VENUE

5.  All of the material events alleged in this Complaint occurred in Cuyahoga County and the Northern District of Ohio.

6.  This Court has personal jurisdiction over Defendants who reside in and conduct business in this District.

7.  Venue is proper under 28 U.S.C. § 1391 because the events giving rise to Shelton's claims took place within this District. Under 28 U.S.C. §§ 1331, 1343, and 2201, Plaintiff Shelton asserts  jurisdiction over federal claims presented herein under 42

4

U.S.C. §§ 1983 and 42 U.S.C. § 2000e et seq. which provide for attorney fees in civil-rights cases including all subject matters of this Complaint.  See Exhibits A and B, (Shelton's EEOC Charge and Notice of Right to Sue) attached hereto. Plaintiff Shelton initiates this action under the Civil Rights Act of 1871, 42 U.S.C. § 1983, through which he asserts claims of governmental retaliation in terminating him and interfering with and preventing outside employment opportunities because of his exercise of a constitutional right guaranteed under the First Amendment to the Constitution of the United States, having engaged in speech through rap videos and made complaints of public concern against the Defendants.

FACTUAL BACKGROUND

8.  Plaintiff William Shelton, is African-American with over eight years of extensive law enforcement experience, was hired in February 2016 by CMHA as a police officer.

9.  Shelton's major job function as a police officer was to assist the Chief of Police and command staff to serve by protecting residents and staff members from harm and CMHA property from loss or damage caused by anti-social acts.

10. Shelton's' police officer job included responding to calls for service; enforcing CMHA's safety and security policies and procedures; providing security anywhere in the CMHA estates; and working with law enforcement.

11. Shelton was regarded by Defendant CMHA as a valuable employee with significant training and commendations.

12. Defendant CMHA's Police Department at all relevant times comprised approximately forty officers, the vast majority of whom were Caucasian, with between nine and ten African-American officers.

Shelton Reports Matters of Public Concern

13. No part of Shelton's job involved filing complaints of harassment, retaliation, or matters of public concern.

14. No part of Shelton's job responsibilities involved filing a racial harassment complaint challenging his disparate treatment by CMHA command staff based upon his race.

15. No part of Shelton's job responsibilities included filing complaints of interference with his outside employment opportunities by CMHA command staff.

16. Shelton was assigned as a detective to the crime suppression unit of CMHA's Police Department.

17. Shelton was a member of the SWAT unit on a part-time assignment.

18. In October 2019, Shelton requested to be removed as soon as possible from SWAT operations. See Exhibit C, attached hereto.

19. Shelton's request was denied by Defendant Gregory Drew.

20. Defendant Drew claimed the Unit at the time was understaffed.

21. On July 10, 2020 Shelton again requested removal from Defendant's SWAT Unit. See Exhibit D, attached hereto.

22. Nearly a month later in August 2020, Defendant Drew summoned Shelton to a meeting in Sgt. Smiddy's office.

23. The meeting was in regard to Shelton's second request to exit the swat team.

24. Defendant Drew stated that although he had not read Shelton's latest request, it was a "mad angry letter."

6

25. Defendant Drew stated that "It doesn't look good when you write an angry memo because it sticks in your file and it's a battle you will not win."

26. Shelton responded to Drew that he (Drew) did not want him to leave on his own but would rather put Shelton out when he was ready.

27. Shelton indicated to Drew that he felt targeted and could feel the tensions in the department as the intended target.

28. Defendant Drew stated that he was not targeting Shelton and would let Shelton off the SWAT team in two months.

29. Defendant Drew's response to Shelton's second request to be removed from SWAT operations in July 2020 was a pretextual ploy to complete his retaliatory targeting of Shelton.

30. On September 18, 2020, Shelton filed a workplace race harassment complaint. See Exhibit E, attached hereto.

31. In his complaint Shelton named specific individuals within his chain of command including Defendant Drew who engaged in racial harassment in the CMHA Police Department which was directed toward Plaintiff Shelton.

32. Shelton submitted his workplace harassment complaint to Defendant CMHA's Human Resources Department. In his complaint, Shelton noted what he believed to be a racist remark by Defendant Drew that "sometimes I don't think you know your place." Shelton also referenced discriminatory treatment of PO Sanders, a Caucasian, who was never penalized with AWOL for missing training, yet Shelton was threatened with discipline by Defendant Drew for missing training. On July 9, 2020, Shelton was informed by his immediate supervisor, Sgt. Smiddy, that Defendant Drew was upset as a result of Shelton's absence from training that day

7

and Smiddy was advised to order Shelton to training immediately or Defendant Drew would mark him as AWOL.

33. In his workplace harassment complaint, Shelton noted racial disparate treatment when he was instructed not to wear a face mask with markings on it. Chief Gonzalez had informed Shelton that his Black Lives Matter mask was a political statement and should not be worn.

34. Department policy was revised to permit only solid color masks without markings.

35. Shelton noted that in July 2020 Defendant's Caucasian officers, POs Sanders, Norwillo, McGilbra, and Sergeants Weis and Neal, each wore masks with thin blue line markings which were out of department policy and worn in front of command staff while on duty.

36. Although each wore masks in violation of the Department's new mask policy, the Caucasian officers were not threatened, targeted, or harassed as Shelton.

Shelton's Rap Videos Are First Amendment Speech

37. Defendant Drew responded to Shelton's harassment complaint by targeting him for termination based upon his rap videos.

38. Defendant Drew responded to Shelton's complaint by searching the internet for Shelton's rap video, "Head Shot" on the same day Shelton submitted his workplace harassment complaint, September 18, 2020.

39. Once Defendant Drew located Shelton's rap videos, Drew proceeded with his laptop to Chief Gonzalez's adjacent office and showed Gonzalez his search results.

40. Defendant Drew proceeded to view Shelton's rap videos with Chief Gonzalez.

41. Defendant Drew harbored racial animus toward Shelton.

8

42. Defendant Drew urged Chief Gonzalez to act against Shelton because the videos, Shelton's First Amendment speech, depicted a mock shooting of a homeless person and violence.

43. Since at least 2018 Members of Defendant CMHA Police Department, both command and staff, were aware that Shelton was a rap artist before he submitted his workplace harassment complaint.

44. Since at least 2018 Shelton had distributed some of his music to co-workers.

45. Since at least 2018 Shelton had also shown some members of Defendant CMHA Police Department his rap videos which were published on YouTube.

46. Some members of the department had also purchased copies of Shelton's rap videos.

47. At Defendant Drew's insistence that Shelton could be either a cop or a rapper, but not both, Chief Gonzalez after watching Shelton's rap video, wanted to immediately place Shelton on administrative leave.

48. Lyrics of Shelton's music involved family members and rap or gangster rap themes.

49. Supervisors in Defendant CMHA Police Department were aware of Shelton's music.

50. Shelton's rap music was created on his own time, out of uniform, and off-duty without any reference to Defendant CMHA or his job as a police officer. Shelton did not brandish a CMHA firearm in the videos.

51. Shelton's supervisor, Sergeant Smiddy, who had heard some of Shelton's music, encouraged him in his rap music production.

52. In 2019, Chief Gonzalez asked Shelton if he would perform some of his music for a gathering of CMHA residents and staff.

9

53. Shelton informed Chief Gonzalez that he did not believe a public performance of his rap music for residents and CMHA staff was appropriate.

54. Shelton, as a result, declined Chief Gonzalez' invitation to perform on CMHA property.

55. At the time, Chief Gonzalez did not counsel or advise Shelton to cease his rap music production or rapping as a hobby.

56. At the time, Chief Gonzalez did not object to Shelton's continued rap music production.

57. At no time prior to his termination did Defendant CMHA or Chief Gonzalez inform Shelton that his rap music or rap videos might be in violation of Defendant CMHA policy or CMHA Police Department policies.

58. At no time prior to his termination did Defendant CMHA or Chief Gonzalez inform Shelton that he could be subject to discipline based on his gangster rap lyrics or videos.

59. Defendant CMHA and Defendant Drew have known since at least 2019 of Shelton's rap music contents.

60. Shelton's rap music could be classified as gangster rap with lyrics depicting violence or sexual themes.

61. To avoid any connection to his position as a police officer or Defendant CMHA, Shelton utilized an alias of "TB" as a rap performer and music producer.

62. In addition to recordings of his rap music, Shelton wrote and produced videos of his music. Shelton posted some of his rap videos on the public YouTube platform.

63. Shelton's rap music and video production was engaged entirely during his off-duty hours.

64. Chief Gonzalez placed Shelton on paid administrative leave on October 7, 2020.

65. On January 29, 2021 Defendant CMHA terminated Shelton's employment for the content of his rap videos.

66. Shelton's termination by Defendant CMHA was causally connected to his speech and his EEO workplace harassment complaints.

67. Following arbitration of whether Shelton's discharge was for just cause, Shelton was reinstated to his CMHA police officer position on September 22, 2022.

68. During his arbitration hearing held in March 30, 2022, April 12, 2022, and May 18, 2022, Shelton first became aware that Defendant CMHA had made a First Amendment assessment of his rap videos and determined that a majority of them were protected by the Constitution.

69. The facts and details of Defendant CMHA's First Amendment assessment were not provided to Shelton in his termination notice or pre-disciplinary hearing.

70. With the continued assistance of Defendant Drew's research, a total of five videos were represented by Defendant CMHA as basis for termination of Shelton—Headshot; Dry Ass Nookie; Great Man Challenge; Bust Down Thotiana; and Talk My Shit Challenge.

71. Defendant CMHA had reviewed nearly a total of twenty rap videos produced by Shelton but only the five referenced in paragraph 70 were considered as justification for  his termination.

11

72. Shelton was terminated without counselling, or a request to take the five videos down or to limit access to his videos.

73. The remaining fifteen videos were recognized by Defendant CMHA as addressing matters of public concern and protected by the First Amendment.

74. Prior to his reinstatement Shelton applied for numerous law enforcement opportunities.

75. Shelton applied for a police officer position with the City of Timberlake, Ohio on or about September 11, 2021. Shelton interviewed with the Police Chief of Timberlake. Shelton has not been hired because of what Defendant CMHA reported to Timberlake's Chief of Police regarding Shelton's termination for rap video content.

76. Shelton has not been hired because of what Defendant Drew reported to Timberlake's Chief of Police regarding Shelton.

77. Shelton also applied for a police officer position with the City of Bedford Heights, Ohio on or about August 24, 2022. Shelton interviewed but on the basis of information provided by Defendant CMHA about him he has not been hired. At Bedford's police roll call, its commander showed the roll call participants Shelton's "HeadShot" YouTube video.

78. Shelton interviewed but on the basis of information provided by Defendant Drew to the City of Bedford Heights command, he has not been hired.

79. After his reinstatement, Shelton returned to duty on November 28, 2022 with Defendant CMHA Police Department. Shelton met with Chief Gonzalez and asked "What about my music? Do I bring it to them or not before I post it?"

12

80. Chief Gonzalez replied to Shelton, "I'm not going to interfere with that. What you do is what you do. I just ask you to remember you are an officer."

81. Shelton's participated in the hiring process for law enforcement positions with the City of Bedford Heights (August 2022) and City of Timberlake (September 2021).

82. After several weeks, Shelton followed up with both prospective employers regarding the status of his applications.

83. Shelton was informed by Bedford and Timberlake police staff that his employment opportunity had been negatively impacted by the actions of Defendant Drew and Defendant CMHA.

84. Upon information and belief, Defendant Drew informed Shelton's prospective employers, and other individuals he knew, about Shelton's rap videos and his termination by Defendant CMHA.

85. Defendant Drew repeated negative statements about Shelton to several individuals of Shelton's prospective public employers.

86. Such statements by Defendant Drew were not random.

87. Such statements by Defendant Drew were intentional and calculated to undermine Shelton's law enforcement employment opportunities.

88. Such statements by Defendant Drew were, at the time undertaken, not authorized by Defendant CMHA.

89. Such statements by Defendant Drew called into question Shelton's' good name, reputation, honor, and integrity as a law enforcement professional.

90. Such statements by Defendant Drew denigrated Shelton's competence as a law enforcement professional.

13

91.  Such statements by Defendant Drew were made to impugn Shelton's professional reputation so as to effectively put a roadblock in Shelton's continued ability to obtain professional employment.

92.  Upon information and belief,  Defendant Drew informed Shelton's prospective employers, and other individuals he knew with such employers, that Shelton should not be hired.

93.  Such acts by Defendant Drew were in retaliation for Shelton's complaints in which Shelton raised matters of public concern.

94.  Such acts by Defendant Drew deprived Shelton of liberty protected by the Due Process Clause of the Fourteenth Amendment.

95.  Such acts by Defendant Drew were not random.

96.  Defendant Drew's acts and statements about Shelton were repeated to his friends in law enforcement and to Defendant CMHA staff.

97.  Such acts by Defendant Drew were intentional and calculated to limit Shelton's employment opportunities.

98.  Such acts by Defendant Drew were a stigma on the property interest of Shelton to a professional reputation and law enforcement career.

99.  Such acts by Defendant Drew were, at the time undertaken, not authorized by any policy of Defendant CMHA.

100. Such acts by Defendant Drew were undertaken with the knowledge of  Defendant CMHA.

101. Such acts by Defendant Drew deprived Shelton of public employment in violation of the First and Fourteenth Amendments and Ohio statutory law.

14

Count One:    42 U.S.C. § 1983—First Amendment Retaliation Against Defendants
(Viewpoint Discrimination)

102.  Plaintiff reincorporates and realleges all prior paragraphs as if fully rewritten herein.

103.  Defendants managed, had authority over, and were materially involved in the decision to terminate Shelton.

104.  Between 2018 and 2020, Shelton created and produced rap music and rap videos in a public YouTube forum, using his private device, in his private time, outside the scope of his official duties as a CMHA employee.

105.  Shelton's rap music and rap videos constitute constitutionally-protected activity engaging in speech on matters of public concern on his personal media account.

106.  As a result of Shelton's constitutionally protected activity, he was subjected to adverse action by Defendants that would chill an ordinary person from continuing in that protected activity.

107.  There was a substantial causal relationship between the Constitutionally-protected activity and the adverse action taken by Defendants against Shelton.

108.  As a direct result of Shelton exercising his constitutional right to speak publicly, in his own time, as a private citizen on a matter of public concern, Defendants retaliated against him, including taking adverse employment actions by terminating Sheldon's employment.

109.  At all times relevant herein, Shelton's speech was on matters of public concern.

15

110. By taking employment action against Shelton that was substantially motivated by the content of Shelton's constitutionally protected speech, Defendants violated Shelton's First Amendment rights.

111. Defendants, acting under color of state law, terminated Shelton's employment with CMHA based on Shelton's YouTube rap videos.

112. Defendants were acting within the scope of their employment when Defendants intentionally terminated Shelton in response to his private YouTube posts.

113. Defendants, in their act of terminating Shelton, engaged in unconstitutional viewpoint discrimination because their actions were substantially motivated by their disapproval of Shelton's speech content.

114. As a direct, foreseeable, and proximate result of Defendants' acts and omissions, Shelton suffered—and continues to suffer—mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort.

115. As a direct, foreseeable, and proximate result of Defendants acts, Shelton suffered significant damages including reputational harm, lost job opportunities, associated wages and lost future income from lost employment opportunities that have been unavailable to him.

116. Defendants acted intentionally and with malice towards Shelton to deny his freedoms protected by the First amendment when they terminated his employment.

117. At the time of Shelton's termination Defendant CMHA had no prohibitions on producing gangster rap music by an employee on his own time.

118.   The same day Shelton filed a workplace harassment complaint, Defendant Drew
       brought Shelton's rap videos to Chief Gonzalez' attention.

119.   Shelton's publication of his rap music on YouTube is not a violation of Defendant's
       Social Media Policy.

120.   Shelton complied with Defendant's Social Media Policy by using an alias and not
       referencing Defendant CMHA or his connection to CMHA.

121.   Guarantees of the First Amendment are extended to all artistic expression such as
       Shelton's music and rap videos.

122.   Chief Gonzalez was shocked by the videos content.

123.   The First Amendment guarantees Shelton's fundamental right to free speech.

124.   Social media platforms like YouTube and Facebook are modern-day equivalents of
       the town square and are subject to traditional public forum analysis for First
       Amendment purposes.

125.   Official censorship based upon a government actor's subjective judgment that the
       content of protected speech is offensive or inappropriate is unconstitutional
       "viewpoint discrimination." *Matal v. Tam*, 137 S.Ct. 1744, 1763 (2017).

126.   Viewpoint discrimination is an egregious form of content discrimination. When
       the specific motivating ideology or the opinion or perspective is the rationale for
       the restriction, the government is required by the First Amendment to abstain from
       regulating speech. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S.
       819, 828 (1995).

127.  By crafting a dubious rationale for Shelton's termination, Defendants decision to take adverse action against Shelton was impermissibly motivated by a desire to suppress a particular point of view.

128.  Shelton's speech in the form of rap music or rap videos may not be suppressed simply because it expresses ideas that are "offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414, 109 S. Ct. 2533 (1989).

129.  The fact that Defendants found Shelton's speech offensive is not sufficient reason for suppressing it.

130.  Nor may Shelton's speech be curtailed because it invites dispute, creates dissatisfaction with conditions the way they are, or even stirs people to anger. *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 63-64, 96 S. Ct. 2440 (1976).

131.  The actions and inactions articulated above violate the Civil Rights Acts of 1866 and 1870, embodied in 42 U.S.C. § 1983, which guarantee that all persons within the jurisdiction of the United States shall have the same rights in every State and Territory to make and enforce contracts, as well as equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

132.  As a direct and proximate result of the intentional and malicious and/or wanton and reckless actions and/or inactions of Defendants Shelton has suffered damages, including punitive damages.

Count Two:  42 U.S.C. § 1983—Fourteenth Amendment Violation Against Defendants

133.  Plaintiff reincorporates and realleges all prior paragraphs as if fully rewritten herein.

18

134.   The actions and inactions articulated above violate the Civil Rights Acts of 1866 and 1870, embodied in 42 U.S.C. § 1983, which guarantee that all persons within the jurisdiction of the United States shall have the same rights in every State and Territory to make and enforce contracts, as well as equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. At all material times, Shelton was engaged in constitutionally protected activity, exercising his clearly established First Amendment rights to speech.

135.   Defendants approval of constitutionally impermissible acts of  Defendant Drew in retaliation for Shelton's exercise of clearly established right to complain of his employer's discriminatory treatment and reports of public concern.

136.   Defendants' adoption   and acceptance of Defendant Drew's constitutionally impermissible   conduct was motivated by the content of Shelton's complaints, reports of public concern, and lawful criticisms.

137.   Defendants' adverse actions violated Shelton's First and Fourteenth Amendment rights to be free of retaliation for complaints and a public hearing in the taking of Shelton's property by depriving him of his liberty under the Fourteenth Amendment.

138.   Shelton states that as a direct and proximate result of the intentional and malicious and/or wanton and reckless actions and/or inactions of Defendants CMHA he  has suffered damages, including punitive damages.

139.   These retaliatory and reckless actions and/or inactions by Defendants were in violation of Shelton's constitutional protections in violation of 42 U.S.C. § 1983.

140.   Defendants' violations of 42 U.S.C. § 1983 entitles Shelton to damages as well under 42 U.S.C. §§ 1988.

19

Count Three:  Defendant Drew's Tortious Interference with Employment Relations

141.    Plaintiff reincorporates and realleges all prior paragraphs as if fully rewritten herein.

142.    Defendant Drew's acts were intentional, willful, and calculated to cause damages to William Shelton in his pursuit of employment with other employers.

143.    Defendant Drew was aware of the existence of Barens' employment applications with at least two employers, City of Bedford Heights, Ohio and City of Timberlake, Ohio.

144.    Defendant Drew intentionally interfered with Shelton's prospective employment relations.

145.    Plaintiff was injured as a proximate result of Defendant Drew's acts.

146.    Defendant Drew had no right or justifiable cause to tortiously interfere with William Shelton's employment relations with prospective employers.

147.    Defendant Drew was not privileged and acted outside the scope of his  responsibility in his role as Lieutenant and communicated false light information regarding William Shelton to individuals with the prospective employers.

Claim 4-Defendants Interfered with Civil Rights Under Ohio Revised Code §§ 2921.45 and 2307.60

148.    Plaintiff incorporates all previous allegations.

20

149.     Under Ohio Revised Code § 2921.45, no public servant, under color of his office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right.  This provision carries a criminal penalty.

150.     Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action.

151.     Defendants CMHA, and Defendant Drew are public servants. Under color of their office, employment, or authority each knowingly deprived William Shelton of his constitutional  and statutory rights as detailed above, including his right to be free from retaliation for reporting matters of public concern and his constitutional right to freedom of speech and due process.

152.     As a direct and proximate result of Defendants unlawful conduct, William Shelton has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including but not limited to pain and suffering, loss of higher salary and wages, and benefits, and other terms, privileges, and conditions of employment.

153.     Defendant CMHA  and Drew's acts were willful, egregious, malicious, and worthy of substantial sanction by this Court to punish and deter them and others in CMHA from engaging in such unlawful conduct.

21

Count Five:    Racial Discrimination under Title VII of the Civil Rights Act, 42 U.S.C.§
               2000e-2 Against Defendants

      154.     Plaintiff incorporates all previous allegations.

      155.     Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2,
it is an unlawful employment practice for an employer to discriminate
against its employees because of race.

      156.     Under Title VII whoever violates this obligation is subject to a civil
action for damages, injunctive relief, or any other appropriate relief.

      157.     Mr. Shelton had a reasonable, good faith belief that CMHA had
discriminated against him on the basis of his race and complained about
this unlawful practice.

      158.     Shelton had a reasonable, good faith belief that CMHA had
discriminated against him in the terms and conditions of his
employment by engaging in heightened scrutiny of his attendance and
threatening him with AWOL status compared to his Caucasian co-
workers.

      159.     Defendants discriminated against Shelton by applying work rules
and policies more strictly to him but not his Caucasian co-workers.

      160.     As a direct and proximate result of this conduct, Shelton has
suffered and will continue to suffer economic and non-economic
damages for which the Defendant CMHA is liable, including but not
limited to pain and suffering, and benefits, and other terms, privileges of
employment.

Count Six:    Retaliation under Title VII of the Civil Rights Act, 42 U.S.C.§
              2000e-3 Against Defendants

>      161.    Plaintiff incorporates all previous allegations.

>      162.    Title VII makes it an unlawful employment practice for an employer
>              to retaliate against an employee because he opposed an unlawful
>              discriminatory practice, such as submitting an internal EEO complaint.

>      163.    Shelton had a reasonable, good-faith belief that Defendant Drew
>              had discriminated against him on the basis of his race and complained
>              about this unlawful practice.

>      164.    Shelton had a reasonable, good-faith belief that he was being
>              retaliated against for his opposition to disparate treatment in the terms
>              and conditions of employment by Defendant Drew.

>      165.    Shelton engaged in protected activity under Title VII by opposing
>              race discrimination internally and reporting the bias of Defendant Drew.

>      166.    Defendant CMHA was aware that Shelton engaged in protected
>              activities, including First Amendment speech.

>      167.    Defendant Drew was aware that Shelton engaged in protected
>              activities complaining about him.

>      168.    Defendants intentionally and maliciously discriminated against
>              Shelton after he opposed unlawful discriminatory practices, i.e., racial
>              discrimination in the terms and conditions of employment of police
>              officers in Defendant CMHA's Police Department including but not
>              limited to: heightened scrutiny on the basis of race; unequal application
>              of work mask rules favoring Caucasians but not African-Americans;

23

pretextually initiating an investigation of Shelton's rap videos after he
made his complaints; and, proceeding to terminate Shelton without any
resident or staff complaints; and terminating Shelton without informing
him that his rap videos could subject him to discipline.

169.    Defendants retaliation changed the terms and conditions of
Shelton's employment and subjected him to adverse employment
actions.

170.    The retaliation Shelton suffered would dissuade a reasonable
employee from opposing discrimination.

171.    Defendant CMHA is vicariously liable for its agents' acts toward
Shelton.

172.    As a direct and proximate result of this unlawful conduct, Shelton
has suffered and will continue to suffer economic and non-economic
damages for which Defendant CMHA is liable, including but not limited
to pain and suffering, benefits, and other terms, privileges, and
conditions of employment.

Wherefore, Plaintiff William Shelton urges this Court to grant the following relief:

A.  Declare the acts and conduct of the defendants, jointly and severally,
having acted under color of state law, constitute retaliation and
violations of Plaintiff's right to petition his government through
litigation as ensured by the First Amendment to the Constitution of
the United States and the Civil Rights Act of 1871, 42 U.S.C. § 1983

24

with respect to two law enforcement positions he sought outside the CMHA;

B.  Declare the acts and conduct of the Defendants, jointly and severally, having acted under color of state law, constitute violations of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States and the Civil Rights Act of 1871, 42 U.S.C. § 1983 with respect to three law enforcement positions he sought outside the Cuyahoga Metropolitan Housing Authority;

C.  Declare that Defendants' acts and conduct constitute violations of federal and state law;

D.  Enjoin Defendants from further retaliating against William Shelton;

E.  Enter judgment in William Shelton's favor on all claims for relief;

F.  Award William Shelton full compensatory damages, economic and non-economic, including but not limited to, damages for back pay, front pay, pain and suffering, mental anguish, emotional stress, humiliation, and inconvenience that he has suffered  and is reasonably certain to  suffer in the future.

G.  Award William Shelton punitive damages as appropriate for all intentional and malicious violations of federal and state law and constitutional rights;

H.  Order Defendants to be responsible for and pay the costs and statutory reasonable attorney fees;

I.   Grant continuing jurisdiction over this matter and grant such further

relief as the court deems necessary, proper, just and equitable in

advancing the public interest.

Jury Demand

Plaintiff demands a trial by jury on all issues within this Complaint.

Respectfully submitted,

Lawrence Mays, Esq.
Law Offices of Lawrence Mays LLC
Ohio Bar No.0038288
4070 Mayfield Rd.
South Euclid, OH 44121
216-208-1287  Phone
216-367-9897  Fax
 Lawrence.Mays@lmayslaw.com

Attorney for Plaintiff William Sheldon