UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM J. SHELTON, | ) | CASE NO.  1:23-cv-483 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| CUYAHOGA METROPLITAN, | ) | **MEMORANDUM OPINION** |
| HOUSING AUTHORITY, *et al.*, | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

Before the Court is Defendants' motion for partial judgment on the pleadings.  (Doc. 19.)

Plaintiff opposed the motion (Doc. 29), and Defendants replied (Doc. 31).  Also fully briefed is

Defendants' motion for summary judgment.  (Docs. 40, 58, and 60.)  For the reasons stated

below, Defendants' motion for partial judgment on the pleadings is GRANTED in part and

DENIED in part.  Pursuant to Rule 56 of the Federal Rules of Civil Procedure, all remaining

claims are summarily dismissed.

I.      **Motion for Partial Judgment on the Pleadings**

A.      **Complaint Allegations**

Plaintiff William J. Shelton[1] ("Plaintiff or "Shelton") alleges the following facts in his

Second Amended Complaint ("SAC").  (Doc. 13.)  Plaintiff was a law enforcement officer

employed by Defendant Cuyahoga Metropolitan Housing Authority ("CMHA").  (*Id.* ¶ 1.)

CMHA hired him as a police officer in the CMHA Police Department ("CMHA PD") in

February 2016.  (*Id.* ¶ 8.)  Plaintiff reported to Defendant Lieutenant Gregory Drew

---

[1] Plaintiff's name is spelled differently in various filings.  The Court will use the spelling stated
in Shelton's SAC.

("Lt. Drew").  (*Id.* ¶¶ 1, 4.)  The CMHA PD employed approximately forty officers, the majority

of whom were Caucasian, with between nine and ten African American officers.  (*Id.* ¶ 12.)

Plaintiff is African American.  (*Id.* ¶ 8.)

Plaintiff was a detective in the Crime Suppression Unit of the CMHA PD.  (*Id.* ¶ 16.)  He

also had a part-time assignment to the SWAT unit.  (*Id.* ¶ 17.)  Plaintiff's job duties included

responding to calls for service; enforcing CMHA's safety and security policies and procedures;

providing security anywhere in the CMHA estates; and working with law enforcement.  (*Id.*

¶ 10.)

On October 4, 2019, Plaintiff submitted a written request to Field Operations Commander

Thomas Burdyshaw ("Cmdr. Burdyshaw") to remove him from SWAT operations as soon as

possible.  (*Id.* ¶ 18; Doc. 13-3.)  On October 9, 2019, Lt. Drew denied the request for several

stated reasons including: Plaintiff's advanced training and demonstration of the required skills

and abilities; Plaintiff's past performance always exceeded Lt. Drew's expectations; being a

member of the SWAT team complimented Plaintiff's assignment in the Crime Suppression Unit;

the SWAT team was down two members; and Management Rights as outlined in the Collective

Bargaining Agreement between CMHA and the FOP, OLC.  (Doc. 15-1; *see also* Doc. 13 ¶¶ 18-

20.)  Lt. Drew's denial further stated, "I believe your continued participation as a member of the

SWAT team is valuable and necessary."  (Doc. 15-1.)

On July 10, 2020, Plaintiff again requested removal from the SWAT Unit in a letter to

Crime Suppression Unit Sergeant John Smiddy ("Sgt. Smiddy").  (Doc. 13 ¶ 21; Doc. 13-4.)  A

month later, in August 2020, Lt. Drew summoned Plaintiff to a meeting in Sgt. Smiddy's office

regarding the request to exit the SWAT team.  (Doc. 13 ¶¶ 22-23.)  Lt. Drew referred to

Plaintiff's July 10, 2020 written request as a "mad, angry letter."  (*Id.* ¶ 24.)  Lt. Drew stated, "It

doesn't look good when you write an angry memo because it sticks in your file and it's a battle you will not win." (*Id.* ¶ 25.)  Shelton told Lt. Drew that he felt targeted and could feel the tensions in the department as the intended target.  (*Id.* ¶ 27.)  Lt. Drew stated he was not targeting Plaintiff and would let Plaintiff off the SWAT team in two months.  (*Id.* ¶ 28.)  Plaintiff alleges Lt. Drew's "response to Shelton's second request to be removed from SWAT operations in July 2020 was a pretextual ploy to complete his retaliatory targeting of Shelton."  (*Id.* ¶ 29.)

On September 18, 2020, Shelton filed a written complaint with the CMHA Human Resources Department ("HR") alleging racial harassment.  (*Id.* ¶¶ 30- 33; *see also* Doc. 13-5.)  In his complaint, Plaintiff alleged Lt. Drew remarked "sometimes I don't think you know your place." (Doc. 13 ¶ 32.)  Plaintiff also alleged discriminatory treatment on July 8, 2020, after Sgt. Smiddy told Plaintiff that Lt. Drew was upset because Plaintiff missed training.  (*Id.*)  Sgt. Smiddy conveyed Lt. Drew would mark Shelton AWOL if Shelton did not report to training immediately.  (*Id.*)  By contrast, when a Caucasian officer missed training, that officer was not threatened with AWOL.  (*Id.*)  Plaintiff also alleged CMHA PD Chief Andres Gonzalez ("Chief Gonzalez") prohibited Plaintiff from wearing "Black Lives Matter" face mask while on duty because it was a political message.  (*Id.*  ¶ 33.)  CMHA PD changed its policy to require solid color masks without markings.  (*Id.* ¶ 34.)  Plaintiff claimed in July 2020, Caucasian officers wore masks with thin blue markings, which were out of department policy, but those officers were not "threatened, targeted, or harassed" like Plaintiff.  (*Id.* ¶¶ 35-36.)

Plaintiff's SAC alleges Lt. Drew responded to Shelton's harassment complaint by targeting him for termination based upon Plaintiff's rap music videos.  (*Id.* ¶¶ 37-38.)  According to Plaintiff, on the same day Plaintiff submitted his workplace harassment complaint, on September 18, 2020, Lt. Drew searched the internet for Plaintiff's music video, "Head Shot."

(*Id.* ¶ 38.)  Lt. Drew, motivated by racial animus, showed that video to Chief Gonzalez.  (*Id.* ¶¶ 39-42.)

Plaintiff acknowledges his "rap music could be classified as gangster rap with lyrics depicting violence or sexual themes," including the "Head Shot" video that "depicted a mock shooting of a homeless person and violence."  (*Id.* ¶¶ 42, 61.)  But Plaintiff alleges Defendants knew about his videos and never indicated a conflict with the videos and his position as a CMHA PD officer until after Shelton submitted his September 18, 2020 complaint.  (*Id.* ¶¶ 43-60.)

On October 7, 2020, Chief Gonzalez placed Plaintiff on paid administrative leave.  (*Id.* ¶ 65.)  On January 27, 2021, Shelton participated in a pre-disciplinary conference.  (*See* Doc. 16 at 240.)[2]  Defendants asserted that Plaintiff's videos violated CMHA and CMHA PD policies and regulations.  (*See id.*)  Plaintiff alleges the conference was the first time Defendants informed him that his videos violated CMHA and CMHA PD policies.  (Doc. 13 ¶¶ 57-58.)

On January 29, 2021, Defendants issued Shelton a termination letter.  (Doc. 15 ¶ 66; Doc. 16 at 240.)  That letter (which is an exhibit to Defendants' Answer) referenced the pre-disciplinary conference and cited CMHA and CMHA PD personnel policies and rules and regulations.  (Doc. 16.)  The termination letter also listed five of Shelton's YouTube videos for violating the cited policies.  (*See id.* at 242.)

In March 2022, Plaintiff and Defendants engaged in arbitration regarding Plaintiff's discharge.  (Doc. 13 ¶ 72.)  During arbitration, Shelton first learned that CMHA conducted a First Amendment assessment of his videos and determined that, aside from the five videos listed in the termination letter, most of them were protected by the First Amendment as addressing

---

[2] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

matters of public concern.  (*Id.* ¶¶ 72, 77.)  The details of CMHA's First Amendment assessment were not provided to Plaintiff in his termination hearing or termination notice.  (*Id.* ¶ 73.)  On September 22, 2022, Plaintiff was reinstated as a CMHA PD officer.  (*Id.* ¶ 68.)  Plaintiff's reinstatement included full backpay and benefits, but Plaintiff asserts that "Defendant CMHA in retaliation has refused to pay Shelton his full back pay award with overtime and interest."  (*Id.* ¶¶ 69-71.)

Prior to his reinstatement, Plaintiff applied for other law enforcement positions.  (*Id.* ¶ 78.)  Plaintiff alleges he interviewed with the City of Timberlake ("Timberlake") in September 2021 but "has not been hired because of what Defendant CMHA [and Defendant Lt. Drew] reported to Timberlake's Chief of Police regarding Shelton's termination for rap video content." (*Id.* ¶¶ 79-80.)  Similarly, Plaintiff alleges he was not hired by the City of Bedford Heights ("Bedford Heights") in August 2022 because of what CMHA and Lt. Drew reported to them. (*Id.* ¶¶ 81-82.)  "At Bedford [Height]'s police roll call, its commander showed the roll call participants Shelton's 'HeadShot' YouTube video."  (*Id.* ¶ 81.)

"Upon information and belief, Defendant Drew informed Shelton's prospective employers, and other individuals he knew, about Shelton's rap videos and his termination by Defendant CMHA."  (*Id.* ¶ 88.)  Plaintiff alleges Lt. Drew's statements to Plaintiff's prospective employers were not authorized by CMHA and were made in retaliation for Plaintiff's workplace complaints.  (*Id.* ¶¶ 92-97.)  Plaintiff further alleges Lt. Drew's statements prevented him from obtaining another public employment position in violation of the First and Fourteenth Amendments and Ohio law.  (*See id.* ¶ 105.)

Plaintiff asserts four federal constitutional claims, two state law claims, and two federal statutory claims under Title VII.  In Count One, Plaintiff alleges viewpoint discrimination and

retaliation under the First Amendment.  (*Id.* ¶¶ 106-36.)  In Count Two, Plaintiff challenges

CMHA's social media policy and related CMHA PD regulations as violating the First

Amendment.  (*Id.* ¶¶ 137-40.)  In Count Three, Plaintiff challenges CMHA's Conduct

Unbecoming Policy and related CMHA PD regulations as violating the First Amendment.  (*Id.*

¶¶ 141-44.)  In Count Four, Plaintiff alleges violations of the Fourteenth Amendment.  (*Id.*

¶¶ 145-52.)  In Count Five, Plaintiff alleges tortious interference with prospective employers

against Lt. Drew.  (*Id.* ¶¶ 153-59.)  In Count Six, Plaintiff alleges violations of § 2921.45 and

§ 2307.60 of the Ohio Revised Code.  (*Id.* ¶¶ 160-65.)  In Count Seven, Plaintiff alleges racial

discrimination in violation of Title VII, 42 U.S.C. § 2000e-2.  (*Id.* ¶¶ 166-72.)  In Count Eight,

Plaintiff alleges retaliation prohibited by Title VII, 42 U.S.C. § 2000e-3(a).  (*Id.* ¶¶ 173-84.)

Defendants move for dismissal and judgment as a matter of law on Counts One through

Six and certain portions of Counts Seven and Eight.  (Doc. 19 at 247.)

### B.     Law and Analysis

#### 1.     Standard of Review

Pursuant to Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but

early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ.

P. 12(c).  A motion under Rule 12(c) is reviewed under the same standard as a Rule 12(b)(6)

motion to dismiss.  *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001)

(citing *Mixon v. Ohio*, 193 F.3d 389, 399-400 (6th Cir. 1999)).

"For purposes of a motion for judgment on the pleadings, all well-pleaded material

allegations of the pleadings of the opposing party must be taken as true, and the motion may be

granted only if the moving party is nevertheless clearly entitled to judgment."  *Jackson v. Pro.*

*Radiology Inc.*, 864 F.3d 463, 466 (6th Cir. 2017) (quoting *S. Ohio Bank v. Merrill Lynch,*

*Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th Cir. 1973)).  A complaint must give notice of what the legal claims are and the factual grounds upon which they rest.  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 437 (6th Cir. 2008); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A Rule 12(c) motion "is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law."  *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991).  The "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).  "[D]ocuments attached to the pleadings become part of the pleadings and may be considered . . . In addition, when a document is referred to in the pleadings and is integral to the claims, it may be considered."  *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co*., 508 F.3d 327, 335-36 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)).

If a plaintiff pleads facts that reveal a flaw in the claim or substantiate a defense, he may plead himself out of federal court.  In other words, "sometimes the allegations in the complaint affirmatively show that the claim is [deficient or disallowed as a matter of law].  When that is the case . . . dismissing the claim . . . is appropriate."  *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012); *see also Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) (motion to dismiss will be granted "if the claim shows on its face that relief is barred by an affirmative defense").

### 2.  Federal Constitutional Claims

Defendants move to dismiss Plaintiff's First and Fourteenth Amendment claims (Counts One through Four) as time-barred.  (Doc. 19 at 251-52.)  "The obligation to plead facts in avoidance of the statute of limitations defense is triggered [where] 'it is apparent from the face of the complaint that the time limit for bringing the claim[s] has passed.'"  *Bishop v. Lucent Techs.,*

*Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992)). "[T]he plaintiff cannot 'escape the statute by saying nothing'" or by relying on the general rule that inferences on a Rule 12 motion run in a plaintiff's favor. *Id.*

"Actions brought pursuant to 42 U.S.C. § 1983 apply the statute of limitations from a state's general personal injury statute." *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 855-56 (6th Cir. 2003); *see also Owens v. Okure*, 488 U.S. 235, 240-41 (1989) ("Because § 1983 claims are best characterized as personal injury actions, we held that a State's personal injury statute of limitations should be applied to all § 1983 claims.") The two-year limitations period applies in the First Amendment and retaliation context. *See, e.g., Khatri v. Ohio State Univ.*, No. 5:18-cv-02962, 2021 WL 534904, at *8 (N.D. Ohio Feb. 12, 2021), *aff'd*, No. 21-3193, 2022 WL 620147 (6th Cir. Jan. 25, 2022); *Oko v. City of Cleveland*, No. 1:21-cv-2222, 2023 WL 4405270, at *6 (N.D. Ohio July 7, 2023) (collecting cases).

### a. Accrual and the Discovery Rule

Federal law determines when a § 1983 claim accrues. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). The claim "accrues when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (citations and quotations omitted). "A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Id.* "In this objective inquiry, courts look to what event should have alerted the typical lay person to protect his or her rights." *Id.*

The parties here agree the correct limitations period is two years for the § 1983 claims, but they disagree when Plaintiff's claims accrued, *i.e.*, when the two-year limitations period began to run. (Doc. 19 at 251-52; Doc. 29 at 447-51.) Defendants argue "the incident giving

rise to Plaintiff's claims accrued no later than January 29, 2021, the date of Plaintiff's termination.  Consequently, Plaintiff had until January 29, 2023, to file a § 1983 claim.  Plaintiff, however, did not file his original Complaint in this matter until March 10, 2023." (Doc. 19 at 252.)

 Plaintiff responds that his § 1983 claims are timely under the discovery rule.  (Doc. 29 at 447-51.)  Plaintiff asserts, "Because Shelton lacked knowledge of Defendant CMHA's First Amendment assessment of his YouTube videos, why his job applications were denied or the cause of his injury, there is at a minimum a question of fact as to the exact date of accrual of his constitutional infringement claim." (*Id.* at 448.)  Plaintiff also argues Defendants' motion should be denied because "Defendants assume that Shelton knew at the time of his termination that Drew or anyone else caused his injury.  However, nothing in the Complaint conclusively establishes when this claim accrued and Shelton was not required to plead this information in his Complaint." (Doc. 29 at 453.)

 On reply, Defendants acknowledge "there appears to be some debate between the United States Supreme Court and the Sixth Circuit regarding the appropriate accrual analysis in the Section 1983 context[.]" (Doc. 31 at 479.)  But they further argue "Plaintiff's Section 1983 claims are time-barred under both the standard accrual rule and the discovery rule." (*Id.*)  Under the standard accrual rule, they assert Plaintiff had a complete and present cause of action when Plaintiff was terminated—on January 29, 2021.  (*Id.*)  Likewise, under the discovery rule, Plaintiff knew or had reason to know of the injury when he was terminated through the exercise of reasonable diligence.  (*Id.*)  Defendants point to the January 29, 2021 termination letter, which "clearly states that Plaintiff's employment was being terminated for posting five specific videos

of himself on YouTube which contain certain lyrics and depictions of violence, and lyrics that are derogatory and offensive to women and promote violence against women." (*Id.*)

"As a general matter, the statute of limitations begins to run when the plaintiff has a 'complete and present cause of action.'" *Reed v. Goertz*, 598 U.S. 230, 235-36 (2023) (quoting *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)). The Sixth Circuit recently confirmed that in § 1983 cases, "plaintiffs can plead themselves out of court on statute-of-limitations grounds if the complaint alleges facts showing that they did not sue in time." *Reguli v. Russ*, 109 F.4th 874, 879 (6th Cir. 2024) (discussing accrual of a First Amendment retaliation claim). The Sixth Circuit acknowledged some of its past decisions sent "mixed messages" regarding the discovery rule in § 1983 claims by holding in some cases, the discovery rule starts the limitations period when the plaintiff knew of the injury, and holding in others accrual begins when the plaintiff knew both his injury and the cause of that injury. *Id.* at 882-83. The Sixth Circuit held, "Under either approach to the discovery rule, our cases leave no doubt that a statute of limitations can start to run even if a § 1983 plaintiff lacks knowledge of *every element* of the claim." *Id.* at 883 (emphasis in original). "Courts universally recognize that the discovery rule begins once a plaintiff learns of *an* injury from the defendant's conduct—even if the plaintiff does not discover the *full extent* of the injury until later." *Id.* (emphasis in original) (citation omitted). "[W]e tie the discovery rule to the date that [plaintiff] learned of [defendant's] adverse action—not the date [plaintiff] learned of [defendant's] motive for this action." *Id.* at 884 (citation omitted).

### b.    First Amendment Claims

In Count One, Plaintiff alleges "Defendants, *in their act of terminating Shelton*, engaged in unconstitutional viewpoint discrimination because their actions were substantially motivated

by their disapproval of Shelton's speech content."  (Doc. 13 ¶ 117 (emphasis added).)  Count

One also characterizes that termination as prohibited First Amendment retaliation.  (*Id.* ¶ 112.)

In Counts Two and Three, Plaintiff alleges certain policies CMHA relied upon when terminating

Plaintiff, the Social Media Policy, the Conduct Unbecoming Policy, and related CMHA PD

regulations, violate the First Amendment. (*See id.* at 179, 181-82.)

　　　　"Whether a plaintiff has a complete and present cause of action under § 1983 turns on the

specific constitutional right at issue."  *Reguli*, 109 F.4th at 880 (citation omitted).  A First

Amendment retaliation claim has three elements:

> First, the plaintiff must have engaged in speech that the First Amendment protects
> . . . .  Second, the state actor must have taken an "adverse" (that is, harmful) action
> against the plaintiff—such as . . . dismissal from governmental employment.  Third,
> a "causal connection" must exist between these elements—such that the protected
> speech motivated (indeed, qualified as a but-for cause of) the adverse action.

*Id.* (citations omitted).

　　　　Plaintiff alleges his rap videos are protected speech, Defendants took an adverse action in

terminating his employment, and there was a causal connection between his protected speech and

termination.  (Doc. 13 ¶¶ 108-20.)  Plaintiff also alleges he learned Defendants determined his

rap videos violated CMHA and CMHA PD policies at his pre-disciplinary conference, and they

terminated him on January 29, 2021 "for the content of his rap videos."  (*Id.* ¶¶ 57-58, 66.)

Plaintiff therefore had a complete and present First Amendment retaliation claim by the end of

January 2021.

　　　　To the extent Plaintiff claims his workplace harassment complaint motivated his

termination, Plaintiff knew of his injury no later than February 17, 2021.  Plaintiff attached as

Exhibit A to his SAC the EEOC charge of discrimination he filed on February 17, 2021, in

which he attested:

> I filed a workplace harassment complaint with Human Resources on September 18, 2020 naming specific individuals within the chain of command. Chief Andre Gonzalez placed me on administrative due to the information Lt. Drew gave him regarding my rap video on September 18. On January 29, 2021, I was informed that my rap video on YouTube was controversial and I was discharged.

(Doc. 13-1 at 190.)  Plaintiff therefore knew of his injury (the January 29, 2021 termination) and the alleged causal connection between his harassment complaint and injury when he made the February 17, 2021 charge.  (*Id.*)  Even under Plaintiff's view of the discovery rule, Plaintiff's First Amendment claims in Count One accrued at the latest by February 17, 2021, and the limitations period expired by February 17, 2023.

The same result follows for Counts Two and Three, where Plaintiff claims certain policies CMHA cited as the basis for his termination violate the First Amendment.  The injury is the same: Plaintiff's termination on January 29, 2021.  Again, even if the discovery rule applies to Counts Two and Three, it does not change the result.  Plaintiff pleaded at his pre-disciplinary conference, he learned of CMHA's position that his rap videos violated CMHA and CMHA PD policies.  (*See* Doc. 13 ¶¶ 57-58.)  Once CMHA terminated Plaintiff because of those polices on January 29, 2021, and cited those polices in the termination letter, Plaintiff's First Amendment claims challenging those policies accrued.  (*See id.* ¶ 66; Doc. 16.)  And as discussed above, Plaintiff's EEOC charge indicates he had notice of the alleged injury by February 17, 2021 at the latest.  The two-year limitations period already expired before Plaintiff filed suit in this Court on March 10, 2023.  For these reasons, Defendants' motion for judgment on the pleadings as a matter of law on Counts One through Three is granted.

### c.    Fourteenth Amendment Claim

Plaintiff also asserts Defendants' adverse actions "depriv[ed] him of his liberty under the Fourteenth Amendment."  (Doc. 13 ¶ 149.)  Plaintiff alleges Defendants retaliated against

Plaintiff for complaining of discriminatory treatment, and the adverse action, his termination, "was based upon vague and overbroad personnel policies."  (*Id.* ¶¶ 147-48.)  Again, CMHA cited the policies at issue in the January 29, 2021 termination letter.  (Doc. 16.)

Because the alleged adverse actions and injury in Count Four are the same as those alleged in Counts One through Three, the accrual date is the same.  Plaintiff's Fourteenth Amendment claim accrued by January 29, 2021—or, at the latest, by February 17, 2021.  In either case, the limitations period expired prior to Plaintiff filing suit in this Court on March 10, 2023.  Defendants' motion for judgment on the pleadings as a matter of law on Count Four is granted.

### 3.    Tortious Interference with Employment Relations – Lt. Drew

Count Five alleges Lt. Drew "intentionally interfered with [Plaintiff's] prospective employment relations."  (Doc. 13 ¶ 156.)  Plaintiff contends Lt. Drew intentionally and willfully tried "to cause damages to [Plaintiff] in his pursuit of employment" with Beford Heights and Timberlake, and Lt. Drew "was not privileged" when he "communicated false light information" regarding Plaintiff to his prospective employers.  (*Id.* ¶¶ 154-59.)

The statute of limitations for a claim of tortious interference is four years under Ohio law. *See* Ohio Rev. Code § 2305.09(D); *Smith v. Nat'l W. Life*, 2017-Ohio-4184, ¶ 11, 92 N.E.3d 169, 173.  Under some circumstances, Ohio courts determine that the true bases for a claim or nature of the relief sought will warrant the application of a different statutory limitations period.  *See Smith*, 92 N.E.3d at 173 (citing cases).  For example, Ohio courts have held that "if a defamation claim fails on the statute of limitations, so too must a tortious interference claim based on the same conduct as the defamation claim."  *Id.*

Lt. Drew unpersuasively argues Count Five should be characterized as a claim for defamation or false light invasion of privacy—for which the limitations period is only one year

under Ohio law—for the following reasons.  (Doc. 19 at 253.)  First, Plaintiff expressly disavows

he is pursuing a legal theory for false light invasion of privacy or defamation.  (Doc. 29 at 455.)

Second, the SAC as pleaded is incompatible with those torts.  Plaintiff alleges he put his music

videos onto public social media.  (Doc. 13 ¶¶ 45, 63.)  Plaintiff does not allege Lt. Drew spread

false information about him, but rather Lt. Drew spread *negative* information about him.  (*Id.*

¶¶ 87-89.)  The SAC alleges Lt. Drew interfered with Plaintiff's prospective employment

opportunities by conveying to those employers that Plaintiff's rap videos (on public platforms)

were the basis for his termination; the SAC does not allege Lt. Drew made defamatory

statements or invaded his privacy.  (*Id.* ¶¶ 87-96, 154-59.)  Count Five is therefore governed by a

four-year limitations period, so this claim is timely.  Lt. Drew's motion for judgment on Count

Five on statute of limitations grounds is denied.

To state a claim for tortious interference with employment relations, a plaintiff must

allege: "(1) the existence of an employment relationship between plaintiff and the employer; (2)

the defendant was aware of this relationship; (3) the defendant intentionally interfered with this

relationship; and (4) the plaintiff was injured as a proximate result of the defendant's acts."

*Gerace v. Biotheranostics, Inc.*, 2022-Ohio-302, ¶ 36, 184 N.E.3d 915, 923 (citation omitted);

*see also Hustler Cincinnati, Inc. v. Cambria*, 625 Fed. App'x 712, 720 (6th Cir. 2015).

Lt. Drew argues this claim is substantively deficient under Ohio law because Plaintiff did

not have an employment relationship with the alleged prospective employers.  (*See* Doc. 19 at

257; Doc. 31 at 482-83.)  Even if submitting an employment application to a prospective

employer does not constitute an employment relationship, Ohio law also recognizes the tort of

tortious interference with business relationships.  *Ginn v. Stonecreek Dental Care*, 2015-Ohio-

1600, ¶ 11, 30 N.E.3d 1034, 1039.  And "interference with a business relationship includes

intentional interference with prospective contractual relations, not yet reduced to a contract." *Id.* at 1040 (quotations and citations omitted).

Here, Plaintiff alleges he applied and interviewed for police officer positions with Timberlake and Bedford Heights (Doc. 13 ¶¶ 79, 81, 85);  Lt. Drew was aware of Plaintiff's applications with those prospective employers (*id.* ¶¶ 80, 82, 155);  Lt. Drew intentionally interfered with Plaintiff's prospective employment by informing Timberlake and Bedford Heights about Plaintiff's rap video and his termination by CMHA, and by repeating negative statements about Plaintiff to prevent him from being hired (*id.* ¶¶ 80, 82, 87-97, 154, 156); and Plaintiff was damaged by not being hired (*id.* ¶¶ 98-105, 157).  Plaintiff plausibly pleaded a claim for tortious interference with business relationships.  For these reasons, Lt. Drew's motion for judgment as a matter of law on Count Five is denied.

### 4.    Civil Liability

In Count Six, Plaintiff alleges Defendants knowingly deprived Plaintiff of his constitutional and statutory rights under Ohio Revised Code § 2921.45 and § 2307.60.  Under § 2921.45(A), "No public servant, under color of the public servant's office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right."  A violation of this section is a misdemeanor criminal offense.  Section 2307.60 recognizes a civil cause of action for violations of § 2921.45.  *Jacobson v. Kaforey*, 2016-Ohio-8434, ¶ 10, 149 Ohio St. 3d 398, 400 (Section 2307.60 "creates a civil cause of action for damages resulting from any criminal act.").

As an initial matter, Plaintiff alleges "Defendants CMHA, and Defendant Drew are public servants" under § 2921.45.  (Doc. 13 ¶¶ 161, 163.)  This statement is simply a legal conclusion.[3]  And from the face of the statute, Plaintiff's assertion as to CMHA is incorrect.[4]

A "public servant" is "(1) Any public official; (2) Any person performing ad hoc a governmental function, including, but not limited to, a juror, member of a temporary commission, master, arbitrator, advisor, or consultant; (3) A person who is a candidate for public office. . . ."  Ohio Rev. Code § 2921.01(B).  A "public official" is "any elected or appointed officer, or employee, or agent of the state or any political subdivision, whether in a temporary or permanent capacity, and includes, but is not limited to, legislators, judges, and law enforcement officers . . . ."  *Id.* § 2921.01(A).  CMHA plainly does not meet the statutory definition of "public servant."  Thus, CMHA is entitled to judgment as a matter of law on Count Six.

Section 2921.45 applies differently to Lt. Drew.  As an employee of a government entity, Lt. Drew meets the statutory definition of a public servant for purposes of § 2921.45.  *See id.* § 2921.01.  As such, he may be subject to civil liability for any violation of § 2921.45.

Defendants assert Count Six is barred by a one-year limitations period.  (Doc. 19 at 257.)  *See* Ohio Rev. Code § 2305.11(A) ("[A]n action upon a statute for a penalty or forfeiture shall be commenced within one year after the cause of action accrued."); *see also Brack v. Budish*, 539 F. Supp. 3d 794, 800-01 (N.D. Ohio 2021) (holding the one-year period applies to § 2307.60); *Marquardt v. Carlton*, No. 1:18-cv-333, 2019 WL 1491966, at *2-3 (N.D. Ohio Apr. 2, 2019)

---

[3] "In determining whether a plaintiff has stated a plausible claim for relief . . . the presumption of truth is inapplicable to legal conclusions."  *Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 839 (6th Cir. 2024) (citations omitted), *cert. denied*, 144 S. Ct. 2689 (2024).

[4] CMHA is a political subdivision of the state.  *See* 1987 Ohio Op. Att'y Gen. No. 87-019 (Ohio A.G.), 1987 WL 290010 (Apr. 2, 1987).

(same).  To Defendants, "case law in this Circuit overwhelmingly applies a one-year statute of limitation."  (Doc. 31 at 483.)

Plaintiff counters that § 2307.60 is remedial and for the benefit of a crime victim, which makes it subject to a six-year limitations period.  (Doc. 29 at 457-58.)  *See* Ohio Rev. Code § 2305.07(B) ("An action upon a liability created by statute other than a forfeiture or penalty shall be brought within six years after the cause of action accrued.").  Plaintiff cites to a recent trend following the Ohio Court of Appeals in *Harris v. Cunix*, 2022-Ohio-839, ¶ 36, 187 N.E.3d 582, 593, which concluded § 2307.60 is remedial, not penal.

Ultimately, dismissal at the pleading stage is only appropriate when the statute of limitations defect is apparent from the face of the complaint.  *See Hoover v. Langston Equip. Assocs., Inc*., 958 F.2d 742, 744 (6th Cir. 1992); *Alston v. Tenn. Dep't of Corr.*, 28 F. App'x 475, 476 (6th Cir. 2002).  Defendants have not established Lt. Drew is entitled to judgment as a matter of law on Count Six.

### 5.     Title VII Claims – Lt. Drew

In Counts Seven and Eight, Plaintiff alleges Defendants engaged in racial discrimination and retaliated against him for submitting his workplace complaint in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-2 and -3.  Plaintiff alleges Lt. Drew is liable in both his official capacity and individual capacity.  (*See* Doc. No 13 ¶ 4.)  Defendants move to dismiss these counts as to Lt. Drew.  (Doc. 19 at 258.)

Plaintiff acknowledges Title VII actions may not be brought against individual employees in their personal capacities.  (*See* Doc. 29 at 459 (citing *Wathen v. Gen. Elec. Co*., 115 F.3d 400, 405 (6th Cir. 1997)); *see also Fisher v. Merryman*, 32 F. App'x 721, 723 (6th Cir. 2002).)  However, Plaintiff asserts Lt. Drew is liable under Title VII in his official capacity under an alter ego theory.  (Doc. 29 at 459-60 (citing *Mitchell v. Fujitec Am., Inc.*, 518 F. Supp.

3d 1073, 1101 (S.D. Ohio 2021)).)  In *Mitchell*, the court noted "'there is support for the proposition that a supervisor may be held liable in his or her official capacity upon a showing that he or she could be considered the 'alter ego' of the employer,' although the Sixth Circuit has not definitively ruled on the issue."  518 F. Supp. 3d at 1100 (citing *Little v. BP Expl. & Oil Co.*, 265 F.3d 357, 362 n.2 (6th Cir. 2001)).  To hold a supervisor liable under this alter ego theory, a plaintiff has to show the supervisor had significant control over the plaintiff's hiring, firing, and working conditions.  *See Little*, 265 F.3d at 362 n.2; *Johnson v. Johnson*, No. 1:11 CV 2530, 2012 WL 1571531, at *2 (N.D. Ohio Apr. 30, 2012).  Plaintiff asserts the SAC adequately alleges Lt. Drew was Plaintiff's supervisor and was in control of Plaintiff's terms and conditions of employment.  (Doc. 29 at 459-60.)

Defendants respond that even if Plaintiff could state Title VII claims against Lt. Drew in his official capacity, those claims should be dismissed as redundant and duplicative of the Title VII claims against CMHA.[5]  (Doc. 19 at 258; Doc. 31 at 484.)  "While not required, dismissal of the redundant claim is permissible."  *Kunkle v. Strickland*, No. 1:09 CV 1760, 2009 WL 10714757, at *5 (N.D. Ohio Dec. 10, 2009).  In fact, courts in the Sixth Circuit "regularly dismiss as redundant claims against agents in their official capacities when the principal entity is also named as a defendant in the suit."  *Carter v. Delaware Cnty. Bd. of Comm'rs*, No. 2:07-CV-1189, 2009 WL 544907, at *14 (S.D. Ohio Mar. 3, 2009); *see also Von Herbert v. City of St. Clair Shores*, 61 Fed. App'x 133, 140 n.4 (6th Cir. 2003) ("[plaintiff's] official-capacity federal claims against [individual defendants] were redundant because they were subsumed by her § 1983 charge against city"); *Smith v. Bd. of Trustees Lakeland Cmty. Coll.*, 746 F. Supp. 2d 877,

---

[5] Except for certain portions of Count 8 discussed below, CMHA does not move for judgment on the pleadings on these counts and Defendants address these claims on summary judgment.  (*See* Doc. 19 at 250 n.3.)

892 n.12 (N.D. Ohio 2010) (noting that courts regularly dismiss claims against agents in their official capacities when the principal entity is also a named defendant); *Kunkle*, 2009 WL 10714757, at *5 (dismissing the official capacity claims against the individual employee as duplicative of the claims against the employer); *Pethel v. Washington Cnty. Sheriff's Off.*, No. 2:06-cv-799, 2007 WL 2359765, *5 (S.D. Ohio Aug.16, 2007) (dismissing claims against the county defendants in their official capacities as redundant where county had been named a defendant); *Gray v. City of Cincinnati*, No. 1:03-cv-119, 2006 WL 2193187, *8 (S.D. Ohio Aug.1, 2006) (granting summary judgment on official capacity claims because they were redundant).

In fact, in *Mitchell*, the very case Plaintiff relies on to assert an "alter ego" official capacity claim against Lt. Drew (Doc. 29 at 459-60), the court dismissed the official capacity claim against the individual CEO defendant as "redundant and duplicative" of the Title VII claims against the corporate employer. 518 F. Supp. 3d at 1101; *see also Maudlin v. Inside Out Inc.*, No. 3:13-CV-00354-TMR, 2014 WL 1342883, at *3 (S.D. Ohio Apr. 3, 2014) (dismissing the official capacity suit as "redundant and duplicative of the suit against [the employer]"). The *Mitchell* court reasoned, "[t]he employer and only the employer can be held responsible for any relief the employee obtains, even if under the official capacity theory. Thus, when an employee has already sued a corporate employer under Title VII, an official capacity suit against a supervisor adds nothing to the litigation." 518 F. Supp. 3d at 1101 (citations and quotations omitted); *see also Monsul v. Ohashi Technica U.S.A., Inc.*, No. 2:08-CV-958, 2009 WL 2430959, at *3 (S.D. Ohio Aug. 6, 2009) (dismissing the "unnecessary" official capacity claims against the individual defendants as "wholly duplicative of the Title VII claims against [the employer] and add nothing to this litigation"). Here, where CMHA would still be liable for any

relief Plaintiff obtains on the Title VII claims against Lt. Drew, the official capacity claims are redundant and duplicative of the Title VII claims against CMHA and add nothing to the litigation.[6]  For these reasons, Lt. Drew is entitled to judgment as a matter of law on Counts Seven and Eight in both his individual and official capacity.

### 6.    Back Pay Allegations

Defendants argue Count 8 is, in part, preempted and otherwise fails to state a claim. (Doc. 19 at 258-60.)  In Count 8, Plaintiff alleges a retaliation theory premised on the refusal to pay all back pay with interest and overtime after his reinstatement.  (Doc. 13 ¶ 180.)  Defendants argue this portion of Count 8 fails for three reasons: (1) any issues related to back pay amount to a claim under Ohio Rev. Code § 4112.02, which are exclusively governed by the parties' collective bargaining agreement and are therefore preempted under § 4117; (2) Plaintiff failed to exhaust his administrative remedies as it relates to his back pay allegations; and (3) Plaintiff's back pay allegations fail to establish a *prima facie* case of retaliation and fail to meet applicable pleading standards.  (Doc. 19 at 258-60.)

Plaintiff responds that he does not refer to or incorporate § 4112.02 claims in Count 8, so Plaintiff has not intertwined his claims with any collective bargaining agreement.  (Doc. 29 at 460.)  Plaintiff asserts that the factual allegations regarding back pay "are set forth only to support Shelton's claim of continuing retaliation by Defendant CMHA."[7]  (*Id.*)

---

[6] Plaintiff also failed to address Defendants' argument that the official capacity claims against Lt. Drew should be dismissed as redundant and duplicative.  (Doc. 30 at 474-75.)  Thus, Plaintiff effectively conceded this point.  *USA Parking Sys., LLC v. E. Gateway Cmty. Coll.*, No. 4:20CV1967, 2022 WL 312230, at *5 (N.D. Ohio Feb. 1, 2022), *aff'd*, No. 22-3523, 2023 WL 8811690 (6th Cir. Dec. 20, 2023) ("Where a party fails to respond to an argument in a motion to dismiss the Court assumes he concedes this point and abandons the claim.") (citing *ARJN #3 v. Cooper*, 517 F. Supp.3d 732, 750 (M.D. Tenn. 2021) (quotations omitted)).

[7] On reply, Defendants assert Plaintiff's response fails to address all of Defendants' arguments on Count 8, so Plaintiff effectively conceded these points and abandoned this portion of the

Defendants do not specify why Plaintiff's retaliation allegations related to back pay invoke his contractual rights under the collective bargaining agreement, and how the claim impermissibly intertwines § 4112.02 with the agreement and remedies Plaintiff seeks under Title VII, a federal statute.  Plaintiff argues Defendants' alleged refusal to pay him the full amount of back pay supports his Title VII statutory claim of retaliation—Defendants have failed to show why the existence of a collective bargaining agreement would prevent him from making such allegations in support of his Title VII rights.  *See generally Smith v. Bd. of Trs. Lakeland Cmty. Coll.*, 746 F. Supp. 2d 877, 897 (N.D. Ohio 2010) ("The existence of a collective bargaining agreement does not prevent an employee from filing and prosecuting claims under federal or state statutes. While an employee's contractual rights under the collective bargaining agreement are subject solely to the grievance procedure contained therein, his statutory rights are not.") (quotations and citations omitted).  Here, Defendants have not proven this portion of the claim— as pleaded—results in dismissal as a matter of law.

Additionally, Defendants assert Plaintiff's back pay allegations are insufficient to establish a *prima facie* case of retaliation and run afoul of pleading standards.  (Doc. 19 at 260.) This argument is not well taken.  In Count 8, Plaintiff alleges after he opposed Defendants' racially discriminatory practices, Defendants retaliated against him in several ways,

> including but not limited to: heightened scrutiny on the basis of race; unequal application of work mask rules favoring Caucasians but not African-Americans; pretextually initiating an investigation of Shelton's rap videos after he made his complaints; and, proceeding to terminate Shelton without any resident or staff complaints; terminating Shelton without informing him that his rap videos could subject him to discipline; and, continuing to refuse to pay Shelton all his over twenty months (20) of back pay with interest and overtime.

claim.  (Doc. 31 at 485.)  The Court disagrees.  Plaintiff disavows he is seeking the relief Defendants argue is (1) preempted, (2) non-exhausted, (3) and fails to state a claim.  (Doc. 29 at 460.)  Plaintiff has adequately responded to Defendants' arguments at this stage.

(Doc. 13 ¶ 180.)  Defendants isolate three allegations related to Plaintiff's back pay and claim those allegations alone fail to state a claim for retaliation.  (Doc. 19 at 260.)  But as Plaintiff contends, and the SAC demonstrates, the allegations regarding back pay are just one example of alleged retaliatory conduct.  At this stage, Plaintiff's allegations, taken as a whole, contain sufficient factual matter, accepted as true, to state a retaliation claim that is plausible on its face. *See Engler*, 862 F.3d at 575 (quoting *Iqbal*, 556 U.S. at 678).  Defendants' motion with respect to Count 8 is denied.

For the reasons above, Defendants' motion for partial judgment on the pleadings pursuant to Rule 12(c) is GRANTED in part and DENIED in part.  Counts One through Four are time-barred and therefore DISMISSED in their entirety.  Count Six is DISMISSED only as to CMHA. Counts Seven and Eight are DISMISSED only as to Lt. Drew in his individual and official capacities.  Defendants' motion is DENIED as to Counts Five and Eight.

## II.  **Motion for Summary Judgment**

The remaining claims are tortious interference (Lt. Drew only), civil liability (Lt. Drew only), Title VII discrimination (CMHA only), and Title VII retaliation (CMHA only).

Before addressing Defendants' motion as to these remaining claims, the Court must resolve Plaintiff's objection to the declarations Defendants submitted in support.  Plaintiff argues the declarations do not comply with 28 U.S.C. § 1746 and cannot be evidence as part of the Court's Rule 56 analysis.  (*See* Doc. 58 at 2535-36; Docs. 40-1-4.)  The declarations are signed, and the statements therein declared under penalty of perjury.  (*See* Docs. 40-1-4.)  The deficiency, as Plaintiff argues, is they do not expressly state the contents are true and accurate. (Doc. 58 at 2535.)  In response, Defendants maintain the original declarations are substantially in the form set forth in 28 U.S.C. § 1746.  (Doc. 60 at 2718 n.3.)  Notwithstanding, Defendants

submitted revised declarations with their reply brief.  (*See id.*; Docs. 60-1-4.)  These revised declarations are identical to the previously submitted versions, save they now declare all contents to be true and accurate.  (*Id.*)

Districts courts have discretion to accept amended declarations.  *See Collazos-Cruz v. United States*, 117 F.3d 1420, 1997 WL 377037, at *3 (6th Cir. July 3, 1997) (reversing district court's exclusion of corrected declaration that complied with § 1746); *Jones v. Pharmerica Corp.*, No. 3:21-CV-00134, 2023 WL 3681711, at *2-3 (M.D. Tenn. Jan. 4, 2023) (permitting revised declaration where it was submitted timely and did not differ in substance from the earlier filed declaration); *see also Ross v. City of Dublin*, Ohio, No. 2:14-CV-02724, 2016 WL 7117389, at *8 (S.D. Ohio Dec. 7, 2016) (recognizing court's discretion to accept amended declarations and accepting amended declaration).  A case cited by Plaintiff, *In re FirstEnergy Corp. Sec. Litig.*, No. 2:20-CV-03785-ALM-KAJ, 2024 WL 1984802, at *6-7 (S.D. Ohio May 6, 2024), *motion to certify appeal denied*, No. 2:20-CV-03785-ALM-KAJ, 2024 WL 3384864 (S.D. Ohio July 12, 2024), did not permit an amended declaration because the request to amend came *after* the Court ruled on the pending motion.  That is not the case here.

Exercising its discretionary authority to do so, the Court accepts the amended declarations for the following reasons: Defendants timely acted to cure the identified deficiency by submitting revised versions with their reply brief; there is no substantive difference between the first-filed declarations and the amended ones; they contain the requisite statement that the contents are true and accurate; and they were submitted before the Court's ruling on summary judgment.

### A.    Undisputed Facts

On February 26, 2016, Plaintiff was first hired as police officer with CMHA PD.  (Doc. 34-1 at 565-67.)  In 2017, Plaintiff resigned from the department to work for the Sandusky Police Department ("Sandusky").  (*Id.* at 583-84.)  Plaintiff was only employed with Sandusky for thirty days.  (*Id.* at 584-87.)  Effective August 14, 2017, Plaintiff was rehired at CMHA PD.  (*Id.* at 587-88.)  Upon Plaintiff's return, Lt. Drew asked Plaintiff if he wanted to join the SWAT Team. (Doc. 60-1 ¶ 4.)

Shelton was required to know and adhere to CMHA's policies and procedures, all of which were detailed in CMHA PD's Rules and Regulations.  (Doc. 34-1 at 575.)  These Rules and Regulations applied when Plaintiff was on duty and when he was off duty. (*Id.* at 603.)

During his off-duty time, Plaintiff created music and videos.  (Doc. 58 at 2519.)  Plaintiff also maintained publicly accessible social media accounts.  (Doc. 34-1 at 527.)  Since March 2020, Plaintiff's social media activity identified him as a CMHA PD officer.  (*Id.* at 528-29, 534-36, 542; Doc. 34-2; Doc. 34-3, Doc. 34-4.)  Specifically, on March 20, 2020, Plaintiff posted a photo of himself to his Instagram account while on duty.  (Doc. 34-1 at 528-29; Doc. 34-2; Doc. 34-3.)  In this photo, Shelton is standing in front of a marked CMHA PD cruiser wearing his CMHA PD uniform.  (Doc. 34-2.)  Plaintiff's Facebook page was linked to his Instagram and YouTube accounts.  (Doc. 34-1 at 534-36, 549-51; Doc. 34-5.)  Plaintiff's Instagram photos automatically posted to his Facebook page.  (Doc. 34-1 at 550-51.)  He had 12,000 Instagram followers and 14,000 Facebook followers.  (*Id.* at 541-46, 549.)  When deposed, Plaintiff could not say whether or not his social media followers included any present or former CMHA residents.  (Doc. 34-1 at 536, 545-46.)

Plaintiff posted videos to his public YouTube channel.  (Doc. 34-1 at 537-38.)  These videos linked to the other social media accounts wherein Shelton identified himself as a CMHA PD officer.  (*Id.* at 773-75.)  Five of Plaintiff's music videos were stated grounds for disciplinary action.  (Doc. 60-4 at 2798-2800.)  Their content is undisputed.

The video most often mentioned in this litigation is the "Head Shot" video.  In it, Plaintiff indiscriminately executes a Caucasian homeless man.  (Doc. 13 ¶ 42; Doc. 35.)  "Head Shot" was filmed on a public street.  (Doc. 34-1 at 768, 770-71.)  Plaintiff provided the homeless man with the open container of liquor shown in the video.  (*Id.* at 789.)  Plaintiff acknowledges he was a CMHA PD officer at the time he filmed this video.  (*Id.* at 770.)

In the video for "WAP Remix – Dry Ass Nookie," Plaintiff brandishes a knife while telling a woman he will "slay" her.  (Doc. 34-1 at 96-99; Doc. 35.)  The "Great Man Challenge" video shows Plaintiff in his car holding a gun and a bottle of liquor.  (Doc. 34-1 at 803-05; Doc. 34-28; Doc. 35.)  The videos for "Bust Down Thotiana" and "Talk My Shit Challenge" contain violent or derogatory comments about women.  (Doc. 34-28; Doc. 35.)

In early September 2020, Sgt. Smiddy reported the "Head Shot" video to Lt. Drew and Cmdr. Burdyshaw.  (Doc. 37-1 at 1207-08; Doc. 60-1 ¶13; Doc. 60-2 ¶ 10.)  Lt. Drew and Cmdr. Burdyshaw then reported the "Head Shot" video to Deputy Chief Victor McDowell. (Doc. 37-1 at 1209; Doc. 60-1 ¶ 14.)

A few days later, on Friday, September 18, 2020, Chief Gonzalez held a regularly scheduled briefing session with Lt. Drew and Cmdr. Burdyshaw.  (Doc. 40 at 1381; Doc. 36-1, at 1132; Doc. 60-1 ¶ 15; Doc. 60-3 ¶ 9.)  During that meeting, Lt. Drew and Cmdr. Burdyshaw asked Chief Gonzalez if he had been briefed on Plaintiff's videos.  (Doc. 34-1 at 677; Doc. 36-1 at 1129-33; Doc. 37-1 at 1209; Doc. 60-1 ¶ 15; Doc. 60-3 ¶ 9.)  Chief Gonzalez said he had not,

so they informed him of the "Head Shot" video and told him how to access it.  (*Id.*)  Chief

Gonzalez reviewed the "Head Shot" video on YouTube.  (Doc. 36-1 at 1131; Doc. 60-3 ¶¶ 9-10;

Doc. 60-1 ¶ 15.)  Lt. Drew advised the videos were circulating throughout the department, and

employees were waiting to see what, if anything, CMHA PD management was going to do about

them.  (Doc. 40 at 1381; Doc. 36-1, at 1132-33; Doc. 60-3 ¶ 11.)

After viewing the "Head Shot" video and other of Plaintiff's publicly posted videos,

Chief Gonzalez was "very concerned and alarmed."  (Doc. 60-3 ¶ 11.)  That same day,

September 18, 2020, Chief Gonzalez immediately escalated the matter to Chief Executive

Officer Jeffery K. Patterson ("Patterson").  (Doc. 36-1 at 1133; Doc. 60-3 ¶ 11.)  Chief Gonzalez

informed Patterson he "had just watched some disturbing videos on YouTube that featured one

of my detectives," and told Patterson he needed to do something about it.  (Doc. 36-1 at 1133-34;

Doc. 60-3 ¶ 11.)  Chief Gonzalez and Patterson did not discuss what actions should be taken, but

Patterson said he would review the matter and get back to Chief Gonzalez.  (Doc. 36-1 at 1134;

Doc. 60-3 ¶ 11.)  On either the following Monday or Tuesday, Patterson told Chief Gonzalez HR

would review the videos and initiate an investigation.  (Doc. 36-1 at 1135; Doc. 60-3 ¶ 12.)

Around 3:30 p.m. on September 18, 2020, the same day Chief Gonzalez reported the

videos to Patterson, Plaintiff submitted a complaint he captioned "Harassment in the Workplace"

(hereafter "complaint") to HR Director Betsy McCafferty ("McCafferty").  (Doc. 34-1 at 665-67,

672-73; Doc. 34-19; Doc. 38-1 at 1283; Doc. 60-4 ¶ 5.)  That day, McCafferty discussed the

complaint then HR Deputy Director Ronaye Steele ("Steele").  (Doc. 38-1 at 1283-88, 1290.)

Other than CMHA's in-house counsel and Steele, McCafferty did not discuss Plaintiff's

allegations with anyone else.  (Doc. 38-1 at 1287, 1289-90.)

CMHA retained outside counsel to investigate Plaintiff's complaint.  (Doc. 34-1 at 678-79; Doc. 38-1 at 1292-93; Doc. 60-4 ¶ 7.)  The investigators went through each of Plaintiff's allegations.  (Doc. 34-1 at 683.)  Outside counsel shared the results of its investigation with CMHA.  (Doc. 38-1 at 1297.)  CMHA communicated the findings to Plaintiff in late December 2020.  (Doc. 60-3 ¶ 14.)  Of the 24 allegations, 23 of them were unsubstantiated.  (Doc. 34-19; Doc. 60-3 ¶ 15, Exhibit A.)  The sole finding related to a comment that Plaintiff alleged Cmdr. Burdyshaw made, that being, "OMG he is Black." [8]  (Doc. 38-1 at 1299-1302; Doc. 34-1 at 683-85; Doc. 60-3 at 2752-53, 2764.)  While Cmdr. Burdyshaw could not recall making the isolated comment, HR addressed the impropriety of such statements with him.  (Doc. 38-1 at 1299-1302.)

Neither Lt. Drew nor Chief Gonzalez were notified of the complaint until several weeks, if not months, after it was filed.  Lt. Drew learned of the complaint in connection with his November 2020 interview with outside counsel.  (Doc. 60-1 ¶ 12; Doc. 37-1 at 1203.)  Chief Gonzalez learned of the complaint when outside counsel disclosed the results of their investigation in December 2020.  (Doc. 60-3 ¶ 14.)  Plaintiff concedes he did not present his complaint to Chief Gonzalez.  (Doc. 34-1 at 674-75.)  Plaintiff does not present evidence that Lt. Drew was aware of Plaintiff's complaint on September 18, 2020.  (*Id.* at 859-62.)

In the months between Plaintiff submitting his complaint and December 2020, Chief Gonzalez placed Plaintiff on paid administrative leave pending the department's investigation of alleged misconduct depicted in and related to the videos.  (Doc. 34-1 at 748-50; Doc. 34-25; Doc. 34-26; Doc. 60-3 ¶ 13.)

On January 6, 2021, CMHA conducted an information gathering meeting with Plaintiff over Zoom, his union representative Chuck Wilson, Chief Gonzalez, McCafferty, and Steele.

---

[8] Cdr. Burdyshaw is not a party to this action.

(Doc. 34-1 at 754-55 ; Doc. 36-1 at 1139; Doc. 60-3 ¶17; Doc. 60-4 ¶ 10.)  Plaintiff was advised there were five music videos that concerned CMHA and CMHA PD.  (Doc. 34-1 at 755; Doc. 60-3 ¶ 17.)  Plaintiff answered questions about the videos.  (*Id.*)

On January 12, 2021, Chief Gonzalez sent a memorandum to McCafferty sharing his observations about the videos and expressing his concerns about Plaintiff's ability to perform his duties as a police officer.  (Doc. 34-1 at 756-57; Doc. 34-27; Doc. 60-3 ¶ 18, Exhibit C.)  Chief Gonzalez outlined the applicable rules and policies Plaintiff violated and expressed concerns that the videos—though created while Plaintiff was off-duty—could negatively affect the reputation of CMHA and CMHA PD.  (Doc. 34-1 at 756-57; Doc. 34-27; Doc. 36-1 at 1145; Doc. 36-2; Doc. 38-1 at 1316-17; Doc. 38-7; Doc. 60-3 ¶ 18, Exhibit C; Doc. 60-4 ¶ 10.)  Chief Gonzalez requested a pre-disciplinary conference.  (*Id.*)

On January 27, 2021, a pre-disciplinary conference was held.  (Doc. 34-1 at 819.)  Plaintiff participated.  (*Id.*)  At its conclusion, McCafferty and Steele agreed, based on the nature of the videos, Plaintiff's statements about them, Chief Gonzalez's memo, and the applicable rules and policies, Plaintiff should be terminated from CMHA PD.  (Doc. 60-3 ¶ 20; Doc. 60-4 ¶ 12.)

On January 29, 2021, Plaintiff was terminated. (Doc. 34-1 at 819-20; Doc. 34-34; Doc. 60-4 ¶¶ 12-13.)  The notice of termination stated Plaintiff's discharge resulted from the videos depicting violent and illegal conduct, promoting violence generally, making derogatory and offensive statements about women, and promoting violence against women, all of which violated several enumerated CMHA and CMHA PD policies, rules, and regulations.  (Doc. 34-34; Doc. 34-1 at 821-22; Doc. 60-4 at 2798-2800.)

On January 29, 2021, Plaintiff grieved his discharge.  (Doc. 34-1 at 824-26; Doc. 34-35.)

On February 17, 2021, Plaintiff filed an EEOC charge of discrimination.  (Doc. 13-1 at 190.)

The arbitrator ruled that Plaintiff must be permitted to return to work with CMHA PD effective

November 28, 2022.  (Doc. 34-1 at 835; Doc. 34-37.)

Prior to his reinstatement with CMHA PD, Plaintiff applied for law enforcement

positions, first with Timberlake (September 2021) and Bedford Heights (August 2022).  (Doc. 13

¶¶ 78-80.)  As part of the application process, Plaintiff signed releases authorizing both police

departments to contact his former employers.  (Doc. 34-1 at 894-904; Doc. 34-43; Doc. 34-44;

Doc. 34-45.)  It is undisputed Lt. Drew was neither contacted by nor did he make any statements

to those departments about Plaintiff.  (Doc. 34-1 at 900-06; Doc. 60-1 ¶ 16.)

### B.    Law and Analysis

#### 1.    Standard of Review

"A party may move for summary judgment, identifying each claim or defense—or the

part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories,

and affidavits show there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  The moving party bears the burden of showing that no

genuine issues of material fact exist."  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021)

(citations and quotations omitted).  A "material" fact is one that "might affect the outcome of the

suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[A]

genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a

verdict for the non-moving party."  *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849–50 (6th Cir.

2020) (citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green, Ky.*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted).  On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005).  A party asserting or disputing a fact must cite evidence in the record or show the record establishes either the absence or the presence of a genuine dispute.  *See* Fed. R. Civ. P. 56(c) & (e).  Rule 56 further provides "[t]he court need consider only" the materials cited in the parties' briefs.  Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quotation and citation omitted).  The Court's role is not to make credibility determinations or "weigh" conflicting evidence.  *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014).  "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Id.*

### 2.    Tortious Interference with Employment Relations – Lt. Drew

As discussed above, to establish a claim for tortious interference with employment relations, a plaintiff must allege: "(1) the existence of an employment relationship between plaintiff and the employer; (2) the defendant was aware of this relationship; (3) the defendant intentionally interfered with this relationship; and (4) the plaintiff was injured as a proximate

result of the defendant's acts." *Gerace*, 184 N.E.3d at 923.  Lt. Drew argues Plaintiff cannot

establish any of these elements and even if he could, any reference to a prospective employer by

Lt. Drew was privileged under Ohio Rev. Code § 4113.71(B).  (Doc. 40 at 1391.)

Because Plaintiff stated no opposition to this claim in response to Defendants' motion for

summary judgment (*see* Doc. 58), Lt. Drew asserts "Plaintiff properly abandoned" this claim.

(Doc. 60 at 2717).  The Sixth Circuit's "jurisprudence on abandonment of claims is clear: a

plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a

motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir.

2013) (collecting cases).  But even if Plaintiff responded, the tortious interference claim still fails

as a matter of law.[9]

As Lt. Drew points out, there is no evidence Lt. Drew made any statements at all about

Shelton to either Timberlake or Bedford Heights.  (Doc. 34-1 at 900-06; Doc. 60-1 ¶ 16.)  And

Plaintiff has presented none.  (*See* Doc. 34-1 at 900-06.)  Plaintiff therefore cannot establish any

interference, let alone intentional interference with Plaintiff's prospective employment

relations.[10]  Lt. Drew's motion for summary judgment on Count Five is granted.

### 3.    Civil Liability – Lt. Drew

Also discussed above, Ohio Rev. Code § 2307.60 "independently authorizes a civil action

for damages caused by criminal acts." *Buddenberg v. Weisdack*, 2020-Ohio-3832, ¶ 6, 161 Ohio

---

[9] This approach aligns with the Sixth Circuit's instructions to district courts analyzing unopposed motions for summary judgment. *E.g., Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991) ("[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded.  The court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged that burden.")

[10] Since Plaintiff's claim fails on the merits, Lt. Drew's assertion of privilege does not need to be addressed.

St. 3d 160, 161, 161 N.E.3d 603, 605 (citation omitted).  As presented here, Plaintiff's civil

liability claim is premised on a violation of Ohio Rev. Code § 2921.45.  Section 2921.45 attaches

criminal liability for interference with, conspiracies to interfere with, and attempts to interfere

with another's constitutionally and statutorily protected rights.[11]

Lt. Drew argues the facts do not support a finding he knowingly caused or attempted to

cause a deprivation of any constitutionally protected right and, even if he did, he is immune from

claims asserted against him in his individual capacity.  (Doc. 40 at 1394 (citing Ohio Rev. Code

§ 2744.03(A)(6)).)[12]

In opposition, Plaintiff defines this claim as being predicated on Plaintiff's "constitutional

right to free speech under the First Amendment."[13]  Framed as evidentiary support for retaliation

for filing the complaint, Plaintiff's opposition brief puts forth scant evidence of Lt. Drew's

actions concerning the videos.  Lt. Drew and Cmdr. Burdyshaw reported the "Head Shot" video

and other videos to Deputy Chief McDowell before Plaintiff submitted his complaint.  (Doc. 58

at 2521.)  On September 18, 2020, they made a similar report to Chief Gonzalez.  (*Id.*)  Chief

Gonzalez immediately reported the video to Patterson and, in doing so, told Patterson CMHA PD

needed to address the videos.  (*Id.*)

---

[11] The Ohio Supreme Court in *Buddenberg* settled a dispute among various state and federal
courts, that being whether a criminal conviction is required to proceed on a claim for civil
liability under § 2307.60.  161 N.E.3d at 606.  It is not.  *Id.*  A conviction can be some evidence,
but the absence of a criminal conviction does not preclude a claim for civil liability under Ohio
law.  *Id.* at 607.

[12] In opposition, Plaintiff says nothing of Lt. Drew's assertion of immunity.  Because the claim
fails on the merits, Lt. Drew's assertion of immunity does not need to be addressed.

[13] Plaintiff's factual summary includes Plaintiff's attempt to wear a "Black Lives Matter" mask
while in uniform.  But Plaintiff neither argues nor presents evidence that Lt. Drew prevented him
from wearing the mask.  (*See* Doc. 58-1 at 2544-45.)

Lt. Drew directs the Court to additional undisputed facts: Sgt. Smiddy reported the video to him in early September 2020.  (Doc. 40 at 1381; Doc. 60-1 ¶¶ 13-14; Doc. 60-2 ¶¶ 9-10.)  The September 18, 2020 meeting with Chief Gonzalez was a regularly scheduled briefing, it was not held to address Plaintiff specifically.  (Doc. 40 at 1381; Doc. 36-1, at 1132; Doc. 60-1 ¶ 15; Doc. 60-3 ¶ 9.)  During that meeting, Lt. Drew told Chief Gonzalez the videos were circulating throughout the department, and employees were waiting to see what, if anything, CMHA PD management was going to do about them.  (Doc. 40 at 1381; Doc. 36-1, at 1132-33; Doc. 60-3 ¶ 11.)

Lt. Drew did not place Plaintiff on paid leave.  He did not terminate Plaintiff's employment.  Instead, Chief Gonzalez placed Plaintiff on paid leave (Doc. 60-3 ¶ 13), and McCafferty made the decision to discharge Plaintiff (Doc. 60-3 ¶ 20).  Lt. Drew was not aware of Plaintiff's complaint until November 2020.  (Doc. 60-1 ¶ 12.)  Plaintiff has presented no evidence to contradict these points.

Notwithstanding this presentation of facts in his opposition brief and the additional facts presented by Lt. Drew, Plaintiff submitted the affidavit of a former partner, who attested to telling Shelton "as soon as his harassment complaint was submitted, Drew would be coming after him.  I told Shelton that 'Drew is going to come for [you].'"  (Doc. 58-3 ¶ 5.)  The Court makes no credibility findings, but it does consider such submission in light of the undisputed timeline of events.

Lt. Drew raised concerns about the videos with his chain of command *before* Shelton submitted his complaint.  (Doc. 60-1 ¶¶ 13-15.)  This is undisputed.  Lt. Drew was unaware of the complaint until November 2020, almost two months after it was submitted to HR.  (Doc. 60-1 ¶ 12.)  Construing all factual inferences in Plaintiff's favor, no jury could conclude Lt. Drew's

statements to his superiors were in retaliation for complaints Plaintiff had not yet made.  And Plaintiff submits no evidence that Lt. Drew engaged in any post-complaint conduct from which a jury could infer he interfered with, attempted to interfere with, or conspired with others to interfere with Plaintiff's First Amendment rights.[14]  Plaintiff failed to present facts to support a finding that Lt. Drew knowingly deprived Plaintiff of any constitutionally or statutorily protected right.[15]  Lt. Drew's motion for summary judgment on Count Six is granted.

### 4.       Title VII Claims – CMHA

Title VII discrimination and retaliation claims based on circumstantial evidence, like the evidence presented here, are evaluated under the *McDonnell Douglas* burden-shifting framework. 411 U.S. 792, 802-03 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400-02 (6th Cir. 2009).

---

[14] Because the factual record eliminates the possibility that Lt. Drew's statements about the videos were in retaliation for a complaint yet to be filed, the Court is not addressing Plaintiff's failure to address that, as a public employee posting music videos to social media accounts identifying him as such, he may not have the protected rights he asserts.  *See Handy-Clay v. City of Memphis*, 695 F.3d 531 (6th Cir. 2012) (while "public employees do not forfeit all their First Amendment rights simply because they are employed by the state or a municipality," they necessarily "accept certain limitations on [their] freedom") (citing *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006)).  The Sixth Circuit has "long recognized 'the importance of deference' to law enforcement officials when speech threatens to undermine the functions of organizations charged with maintaining public safety."  *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017); *see also Kirkland v. City of Maryville, Tenn.*, 54 F.4th 901, 909 (6th Cir. 2022) (the "heightened need for order, loyalty, and efficiency in law enforcement agencies" justified defendant's concern that plaintiff's Facebook post threatened to undermine the police department and supported plaintiff's termination).

[15] *See Buddenberg v. Est. of Weisdack*, No. 1:18-CV-00522, 2024 WL 159001, at *57 (N.D. Ohio Jan. 16, 2024) ("Because the Court has determined that Plaintiff's federal and State law claims fail as matters of law, there is no underlying deprivation of a constitutional or statutory right to satisfy this statute and provide Plaintiff with a remedy.  Therefore, Plaintiff's claim for interference with civil rights fails"); *Cromer v. City of Cleveland*, No. 20-CV-2080, 2021 WL 293046, at *4 (N.D. Ohio Jan. 28, 2021) ("[Plaintiff's] Ohio Rev. Code § 2307.60 claim is dismissed with prejudice because the Court finds that there is no federal constitutional violation in this case").

Under this tripartite test, the plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnel Douglas Corp.*, 411 U.S. at 802-03; *Burdine*, 450 U.S. at 252-53. This burden "is not onerous." *Burdine*, 450 U.S. at 253. If established, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* Should the defendant carry the burden, the plaintiff must prove the stated justification is pretext for discrimination. *Id.* Throughout this entire process, the burden of persuasion remains on the plaintiff to demonstrate intentional discrimination. *Id.*

### a.    Discrimination

To establish a *prima facie* case for Title VII race discrimination, a plaintiff must establish that he: (1) is a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for his position; and (4) was either replaced by someone outside the protected class *or* was treated differently than similarly-situated, non-protected employees. *Peeples v. City of Detroit*, 891 F.3d 622, 634 (6th Cir. 2018).

There is no dispute as to the first three elements. And Plaintiff does not contend he was replaced by someone outside of his protected class. CMHA's challenge is to whether there is any evidence Plaintiff "was treated less favorably than similarly situated, nonprotected employees." (Doc. 40 at 1395.) To be "similarly situated" the other employee must be similar to Plaintiff in "all *relevant* respects." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir.1998)) (emphasis in original). Although not an exclusive list of factors to consider, the other employee "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would

distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (citation omitted).

Plaintiff's opposition brief makes no mention of such a similarly situated employee.  In earlier portions of his opposition brief, Shelton mentions Caucasian officers who were not told to remove "Blue Lives Matter" masks.  (Doc. 58 at 2520.)  He also mentions being threatened with AWOL for missing SWAT training when Caucasian officers were not told the same.[16]  (*See* Doc. 34-1 at 739-47, 851-52, 879-83; Doc. 60-3 at 2745, 2780.)  But Plaintiff has not shown—as he must—these other employees shared a supervisor with him or the absence of mitigating or differentiating circumstances.  Thus, Plaintiff has not demonstrated his *prima facie* case.

Instead of addressing the *prima facie* case in his opposition brief, Shelton jumps ahead in the *McDonnell Douglas* analysis and asserts (without any citations to case law or the record) that CMHA's reasons for terminating him were pretextual.  (*See* Doc. 58 at 2536-2537.)  Plaintiff's arguments about pretext cannot be considered by the Court if he has not first established a *prima facie* case of discrimination.[17]  This he has not done.  CMHA's motion for summary judgment on Count Seven is granted.

---

[16]  Plaintiff compares himself to Officer Sanders, who he alleged overslept and missed multiple SWAT trainings but was not disciplined.  (Doc. 58-1 at 2541-42; Doc. 34-1 at 746-47.)  However, Plaintiff was disciplined for disobeying the directive to report to training late after he called in that the overslept—he was not disciplined for oversleeping.  (Doc. 34-1 at 739-46.)  Plaintiff further concedes he does not know whether Officer Sanders ever disobeyed an order for which he was not disciplined.  (*Id.* at 747.)

[17]  Even if Plaintiff could establish a *prima facie* discrimination case, as discussed below, CMHA articulated a legitimate, non-discriminatory reason for termination, and Plaintiff has not demonstrated CMHA's stated reason was pretextual.

### b.    Retaliation

To establish *a prima facie* case for a Title VII retaliation claim, the employee must produce evidence showing that (1) he engaged in protected activity, (2) the employer was aware of the protected activity, (3) the employer took an action that was materially adverse to the employee, and (4) there is a causal connection between the plaintiff's protected activity and the employer's adverse action.  *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 343-44 (6th Cir. 2021).

It is undisputed Plaintiff engaged in protected activity by submitting his complaint to HR and his termination was an adverse action.  However, CMHA asserts "Plaintiff cannot establish the second element" of his *prima facie* case because he "has no evidence to suggest that Smiddy, Drew, or Gonzalez knew that Plaintiff was going to or had submitted a complaint to HR" at the time they reported Plaintiff's music videos.  (Doc. 40 at 1397; *see also* Doc. 34-1 at 859-63, 907-08; Doc. 60-1 ¶ 12; Doc. 60-2 ¶ 12; Doc. 60-3 ¶ 14; Doc. 60-4 ¶¶ 4-7.)  Plaintiff responds, with no citation to the record, "Defendants were aware that Plaintiff was asserting his First Amendment rights: the Plaintiff hand-delivered his workplace harassment complaint to Defendants."  (Doc. 58 at 2537.)  To be clear, the complaint was submitted on September 18, 2020.  The videos were being discussed among members of Shelton's chain of command before and on that day.  Notwithstanding, HR received Shelton's complaint on September 18, 2020, at or around 3:30 p.m.  (Doc. 60-4 ¶ 5.)  And HR participated in the decision to discharge Shelton.  (*Id.* ¶¶ 10-12.)  This evidence is sufficient to show CMHA knew of his protected activity.  (*See id.* ¶¶ 4-12, 2798-2800; *see also Proffitt v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 150 F. App'x 439, 442-43 (6th Cir. 2005) (knowledge of an employee's protected activity can be shown by circumstantial evidence).)

CMHA also argues Plaintiff cannot prove the fourth element of the *prima facie* case: causation.  (Doc. 40 at 1398.)  "To prove causation in a Title VII retaliation case, a plaintiff must show that the employee's protected activity was a 'but for' cause of the employer's adverse action against [him], meaning the adverse action would not have occurred absent the employer's desire to retaliate."  *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 360 (2013)).

To support "but for" causation, Plaintiff argues "immediately after Plaintiff filed his workplace harassment complaint, Defendants used Plaintiff's music and music videos as a pretext to terminate his employment."  (Doc. 58 at 2537.)  The complaint was submitted to HR on September 18, 2020.  Plaintiff was terminated on January 29, 2021.[18]  There is a difference of months, not days or weeks.  *See George*, 966 F.3d at 459.

The undisputed timeline of events precludes even an inference that "but for" the complaint, Plaintiff would not have been terminated.  In early September 2020, Sgt. Smiddy reported the "Head Shot" video to Lt. Drew.  (Doc. 40 at 1381; Doc. 60-1 ¶¶ 13-14; Doc. 60-2 ¶¶ 9-10.)  It was then reported to Deputy Chief McDowell.  (Doc. 58 at 2521.)  On September 18, 2020, Lt. Drew and Cmdr. Burdyshaw told Chief Gonzalez about Plaintiff's videos.  (Doc. 40 at 1381; Doc. 36-1, at 1132-33; Doc. 60-1 ¶ 15; Doc. 60-3 ¶¶ 9, 11.)  Chief Gonzalez then immediately escalated the matter to Patterson and told him he needed to do something about it.  (*Id.*)  Later that day, around 3:30pm, Plaintiff delivered his complaint to HR.  (Doc. 34-1 at 665-67, 672-73; Doc. 34-19; Doc. 38-1 at 1283; Doc. 60-4 ¶ 5.)  What Plaintiff does not address is that his videos were being reported up the chain of command *before* his complaint was ever

---

[18] While Shelton was placed on paid administrative leave on October 6, 2020, he does not identify this as an adverse action.  (*See* Doc. 58 at 2537.)

filed.  And while some reporting, namely the reporting to Patterson, occurred on the same day, Chief Gonzalez did not know of the complaint when he told Patterson that CMHA PD needed to address the videos.  (Doc. 60-3 ¶¶ 13, 17-20; Doc. 60-4 ¶¶ 8, 10-13.)  Plaintiff therefore cannot establish causation.

Even assuming Plaintiff established his *prima facie* case of retaliation (which he did not), CMHA articulated a legitimate, non-discriminatory reason for termination.  The Sixth Circuit has "held on many occasions that the violation of a wide variety of an employer's articulated policies constitutes a legitimate, nondiscriminatory reason for adverse employment actions.  *Santiago v. Meyer Tool Inc.*, No. 22-3800, 2023 WL 3886405, at *4 (6th Cir. June 8, 2023) (citations omitted).  Here, CMHA determined five of Plaintiff's publicly posted rap music videos violated CMHA and CMHA PD policies, rules, and regulations.  This was all laid out in Plaintiff's January 29, 2021 termination letter.  (Doc. 60-4 at 2798-2800.)

Plaintiff also cannot prove pretext.  "Plaintiffs typically show pretext in one of three ways: '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action.'"  *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (quoting *Chen*, 580 F.3d at 400).  The ultimate inquiry is whether the employer fired the employee for the stated reason or whether the employer made up its stated reason to conceal retaliation.  *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (citations omitted).  Put another way, was the stated reason provided in order to hide the true motivation—retaliation?  *Id.*  A plaintiff is therefore "required to offer evidence from which a jury could reasonably reject the defendants' stated reason for disciplining—and ultimately firing—[him], and that it used those reasons to mask its retaliation against [him for his protected activity]."  *Id.*

Plaintiff does not dispute his videos (1) show him indiscriminately executing a homeless man and promoting violence against women, or (2) violated CMHA policies, rules, and regulations.  (*See* Doc. 60-4 at 2798-2800.)  And as discussed above, the timeline of events establishes CMHA began taking measures to address the videos before Plaintiff filed his complaint.  Plaintiff therefore has not provided evidence sufficient to support that a jury could find CMHA's stated reason for firing him masked retaliation.

For these reasons, Shelton has not established a *prima facie* case of retaliation.  And, even if he did, CMHA provided a legitimate, non-discriminatory reason, and Shelton cannot establish the reason was pretextual.  The Title VII retaliation claim fails as a matter of law, and CMHA's motion for summary judgment on Count Eight is granted.

## III.  <u>Conclusion</u>

For the reasons stated herein, Defendants' motion for partial judgment on the pleadings is GRANTED in part and DENIED in part.  Defendants' motion for summary judgment is GRANTED on the remaining claims.[19]  This case is dismissed.


**IT IS SO ORDERED.**


Date:  September 27, 2024

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE

---

[19] Defendants also moved to exclude Plaintiff's experts (Docs. 22, 23).  Because Plaintiff's First Amendment claims are time-barred and all remaining claims are dismissed under either Rule 12(c) or Rule 56, these motions are DENIED as moot.